WISCONSIN DEPARTMENT OF REVENUE, Petitioner-Appellant,

v.

J. C. PENNEY COMPANY, INC., Respondent.

Court of Appeals

No. 81–1740. Submitted on briefs April 8, 1982.— Decided July 27, 1982.
(Also reported in 323 N.W.2d 168.)

For the petitioner-appellant the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, and *Gerald S. Wilcox,* assistant attorney general.

For the respondent the cause was submitted on the brief of *Leonard S. Sosnowski* and *Foley & Lardner* of Milwaukee.

Brief of amicus curiae was filed by *James P. Brody* and *Russell D. Feingold* and *Foley & Lardner* of Milwaukee on behalf of *The Journal Company* and *Newspapers, Inc.*

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

DYKMAN, J. The Wisconsin Department of Revenue appeals from an order affirming the decision of the Wisconsin Tax Appeals Commission. We affirm the order in part and reverse it in part.

J.C. Penney maintains a mail order and retail business in Wisconsin. It mailed free catalogs to Wisconsin residents from September 1, 1969 to January 31, 1975, the period for which the department seeks to assess taxes. The catalogs were produced by a printer in Indiana, which sent them to their Wisconsin destinations by mail or common carrier.

J.C. Penney buys advertising supplements known as "preprints" from a printer in Minnesota. It pays Wisconsin newspapers to distribute preprints with specified editions of the papers and instructs the printer to deliver the preprints to the newspapers. The preprints delivered to the paper bear the words "supplement to" and the name of the newspaper. Because there may be more papers printed than there are preprints to accompany them, not every copy of a newspaper will necessarily include the preprint. The printer sends about five percent of the preprints directly to J.C. Penney's retail stores.

The department seeks to assess a use tax against J.C. Penney on the catalogs shipped from Indiana to Wisconsin and on the preprints distributed with Wisconsin newspapers. The commission determined that J.C. Penney did not "use" the catalogs within the meaning of the statute and that the preprints constitute "newspapers" which are exempt from taxation. The circuit court affirmed the commission's decision.

The following issues are raised on appeal:

1. Is J.C. Penney liable for use tax on catalogs printed out of state and sent without charge to persons in Wisconsin?

2. Does imposition of use tax on catalogs printed out of state and sent to Wisconsin residents violate the commerce clause of the United States Constitution?

3. Is J.C. Penney liable for use tax on preprints which are printed out of state and distributed with Wisconsin newspapers?

*Standard Of Review*

The facts are substantially undisputed. The application of a statute to a set of facts is a question of law. *Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 758, 300 N.W. 2d 63, 68 (1981). This court therefore accords no special deference to the determinations of the circuit court or the commission as to the applicability of the use tax statutes to these facts. *Department of Revenue v. Horne Directory, Inc.*, 105 Wis. 2d 52, 56, 312 N.W.2d 820, 823 (1981).

*Catalogs*

Section 77.53, Stats. (1975), provides in relevant part:

(1) An excise tax is hereby levied and imposed on the storage, use or other consumption in this state of tangible personal property . . . .

(2) Every person storing, using or otherwise consuming in this state tangible personal property purchased from a retailer is liable for the tax imposed by this section. . . .

The department contends that J.C. Penney used the catalogs in this state. "Use" is defined by sec. 77.51(15), Stats. (1975), as "the exercise of any right or power over tangible personal property incident to the ownership, possession or enjoyment of that property . . . ." The statutory definition of use thus includes two elements: (1) the taxpayer must own, possess, or enjoy the property in Wisconsin; and (2) the taxpayer must exercise some right or power over the tangible personal property in Wisconsin. *Horne Directory*, 105 Wis. 2d at 61, 312 N.W.2d at 825.

We need not consider whether J.C. Penney owned, possessed or enjoyed the catalogs in Wisconsin because we conclude that the second element of the "use" test was not met.

Because the catalogs moved by mail or common carrier from Minnesota to Wisconsin, they remained the property of the printer until they were delivered. Sec. 77.51 (4r), Stats. (1977).[1] After delivery, the recipients assumed ownership of the catalogs, and were free to read, store, or destroy them. These facts are indistinguishable from those in *Horne Directory*, where the court noted that "[t]he only 'right or power' exercised over the directories in this state was exercised by the printer, who

---

[1] Section 77.51(4r), Stats. (1975), provides:

A sale or purchase involving transfer of ownership of property shall be deemed to have been completed at the time and place when and where possession is transferred by the seller or his agent to the purchaser or his agent, except that for purposes of this subsection a common carrier or the U.S. postal service shall be deemed the agent of the seller, regardless of any f.o.b. point and regardless of the method by which freight or postage is paid.

had possession and control over them at all times through its delivering agents, and by their ultimate recipients, the subscribers." *Horne Directory,* 105 Wis. 2d at 60, 312 N.W.2d at 824.

The department seeks to distinguish *Horne Directory* by noting that J.C. Penney maintains a copyright interest in its catalogs. It argues that the copyright gives J.C. Penney a right or power over the catalogs. It cites no authority for this proposition, and its argument misapprehends the nature of copyrights. "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied." 17 USC sec. 202. The recipients of the catalogs are free to sell or dispose of them without the permission of the copyright owner. 17 USC sec. 109(a). J.C. Penney therefore exercises a right only over the intangible intellectual property protected by the copyright. It has no right or power over the "tangible personal property" on which the use tax is levied. Sec. 77.53(1), Stats. (1975).

The department argues that J.C. Penney stored the catalogs in Wisconsin. "Storage" is defined as "any keeping or retention in this state for any purpose except sales in the regular course of business or subsequent use solely outside this state of tangible personal property purchased from a retailer." Sec. 77.51(14), Stats. (1975). By application of sec. 77.51(4r), Stats. (1975), the catalogs were in the custody of the printer through its agents while the catalogs were in transit. Ownership passed to the recipients upon delivery to them. J.C. Penney's actions in arranging for the transfer of the catalogs from the printer to the recipients did not constitute "keeping or retention" of the catalogs in Wisconsin. *Horne Directory,* 105 Wis. 2d at 60, 312 N.W.2d at 824.

The department also argues that J.C. Penney "otherwise consumed" the catalogs in this state. " 'Consumption' goes further than 'use' in that the exercise of consumptive rights or powers over the property renders it, through destruction or deterioration, less useful to others for the same purpose." *Dept. of Revenue v. Milwaukee Refining Corp.*, 80 Wis. 2d 44, 51, 257 N.W.2d 855, 859 (1977). J.C. Penney did not exercise a consumptive right or power over the catalogs in Wisconsin. *Accord, Horne Directory,* 105 Wis. 2d at 62, 312 N.W.2d at 825.

The department contends that it is inconsistent to impose use tax on catalogs printed and delivered in Wisconsin but not on catalogs printed outside Wisconsin and delivered to Wisconsin consumers. This contention is more appropriately directed to the legislature.

We need not decide whether the commerce clause has been violated.

*Preprints*

J.C. Penney contends, and the commission and circuit court concluded, that its preprints fall within the newspaper exception. Section 77.54, Stats. (1975), provides:

There are exempted from the taxes imposed by this subchapter:

. . . .

(15) The gross receipts from the sale of and the storage, use or other consumption of newspapers and periodicals regularly issued at average intervals not exceeding 3 months.

"Newspaper" is not defined by statute. The common meaning of a word used in a statute may be established by reference to a recognized dictionary. *In Interest of B.M.,* 101 Wis. 2d 12, 18, 303 N.W.2d 601, 605 (1981). "Newspaper" is defined in *Webster's Third New Inter-*

*national Dictionary* (1976) as "a paper that is printed and distributed daily, weekly, or at some other regular and usually short interval and that contains news, articles of opinions (as editorials), features, advertising, or other matter regarded as of current interest."

The preprints contain only advertising for J.C. Penney products. Standing alone, they do not fit the definition of "newspaper." J.C. Penney argues that the preprints are component parts of a newspaper. We disagree. Tax exemptions are matters of legislative grace and tax statutes are to be strictly construed against granting exemptions. The taxpayer "must point to an express position granting such exemption and bring [itself] clearly within the terms of the exemption" before we may construe the exemption in its favor. *Ramrod, Inc. v. Department of Revenue,* 64 Wis. 2d 499, 504, 219 N.W.2d 604, 607 (1974).

J.C. Penney relies on *Sears, Roebuck and Co. v. State Tax Commission,* 345 NE2d 893 (Mass. 1976), to support its argument that preprints are component parts of newspapers. The *Sears* holding relied on *Friedman's Express v. Mirror Transp. Co.,* 71 F Supp 991 (D NJ 1947), *aff'd* 169 F2d 504 (3d Cir. 1948). The *Friedman's Express* court held that comic supplements fell within the definition of "newspaper." It concluded that comic supplements are part of the "melange . . . known as special sections of the paper." *Friedman's Express,* 71 F. Supp. at 992.

The collection in its entirety is recognized as a Newspaper and is carried and distributed as such without distinction as to sections. Each section is thus an integral part of the newspaper, *made so not because it is physically folded in a news section, but because it has assumed the character of the journal of which it is a part;* and each bears at its masthead the name of the publication of which it is a part. *Id.* (emphasis added).

Preprints consist of separate, printed sections and are folded in with the newspaper, but differ substantially from comics, want ads, and other newspaper sections. This difference was discussed in *Caldor, Inc. v. Heffernan,* 440 A.2d 767, 771–72 (Conn. 1981) :

> The preprint supplement is prepared by an entity totally independent of the publisher and is not made a part of the newspaper at short, regular intervals. It is inserted into the newspaper, not as an intergral part designed to capture a regular audience, but rather to make use of the newspaper's extensive distribution system. On the other hand, a comic section is inserted at short, regular intervals. It becomes an integral part of the newspaper, not because it is physically folded within any particular edition, but because it contributes to the character of the newspaper. . . . An advertising supplement, inserted into the newspaper at irregular intervals, is not like a member of the family of sections making up the newspaper, but is more similar to the occasional houseguest.

The first distinction addressed by *Caldor* is preparation and ownership of the preprints. The record shows that if J.C. Penney were to buy advertising from a newspaper, it would send its advertising copy to the paper which would print and retain ownership of the pages. When J.C. Penney instructs its Minnesota publisher to print a preprint, it sends its advertising copy to that printer. J.C. Penney owns the printed pages that are produced.

The second distinction between a preprint and a newspaper found significant in *Caldor* concerns the contribution the section makes to the character of the paper, and the frequency with which the section appears. Want ads appear in every issue of most daily papers. Comic sections, television guides, and other features appear at short, regular intervals. Although those sections contribute to the character of the paper, preprints do not.

Advertising preprint supplements are not a regular feature of any newspaper. A supplement defines itself as such, as opposed to purporting to be a component part of the newspaper. Furthermore, advertising supplements do not necessarily appear in each edition of a particular newspaper. Their appearance in the paper and the extent of its distribution is dictated by [the merchandiser's] advertising policy.

*Ragland v. K-Mart Corp.,* 624 S.W.2d 430, 432 (Ark. 1981). There is no evidence that J.C. Penney's preprints appear in a newspaper at short, fixed intervals, as do newspaper sections. Because there may be fewer preprints printed than there are newspapers to carry them, some buyers of a day's newspaper may not receive a preprint. If a newspaper edition failed to carry a particular preprint, few readers would notice.

Although readers might find preprints useful, no evidence of record shows that they look forward to reading a particular merchandiser's preprints at short, regular intervals. Preprints therefore do not contribute to or assume "the character of the journal of which [they are] a part . . . ." *Friedman's Express,* 71 F. Supp. at 992. "Their physical presence in the newspaper does not change that edition's character. They do not become an ingredient or component part of the newspaper . . . ." *Caldor,* 440 A.2d at 772.

The reasoning of *Ragland* and *Caldor* is persuasive and consistent with the rule of strict construction of tax exemptions. We therefore hold that advertising preprints are not "newspapers" for the purpose of sec. 77.54(15), Stats. (1975).

J.C. Penney argues that it escapes liability because it does not store, use, or otherwise consume the preprints in this state. Sec. 77.53, Stats. (1975). It contends that its preprints, like its catalogs, are printed out of state and

sent to consumers without ever being stored, used, or otherwise consumed by J.C. Penney.

The facts establish a use of the preprints in Wisconsin. By operation of sec. 77.51(4r), Stats. (1975), ownership of the preprints is transferred when delivery is completed. The preprints are owned by J.C. Penney after delivery of the preprints to the newspaper and before they are delivered to their ultimate recipients. J.C. Penney determines the date of distribution and the number to be distributed. J.C. Penney therefore exercises ownership of and a right or power over the preprints in this state. Both elements of the definition of "use" are satisfied. *Horne Directory,* 105 Wis. 2d at 61, 312 N.W.2d at 825.

J.C. Penney argues that the department is bound by a Technical Information Memorandum it promulgated on September 3, 1969, which stated that circulars, handbills, and the like were not included within the term "newspapers" unless distributed as part of a publication which constitutes a newspaper. The department amended the memorandum on May 15, 1973, to state that advertising supplements are not included in the definition of newspapers. The department subsequently promulgated Wis. Adm. Code, sec. TAX 11.19, retroactive to September 1, 1969. That rule provides that advertising supplements are exempt only if printed or purchased by the newspaper. J.C. Penney contends that its preprints are exempt from tax levy for the period prior to May 15, 1973.

J.C. Penney cites no authority for its argument and does not explain the theory upon which it is based. If, as we assume, the theory is in the nature of equitable estoppel, reasonable reliance on another's conduct is a prerequisite to its invocation. *Mohr v. Milwaukee,* 101 Wis. 2d 670, 678, 305 N.W.2d 174, 178 (Ct. App. 1981), *revd*

*on other grounds,* 106 Wis. 2d 80, 315 N.W.2d 504 (1982).
No evidence is of record that J.C. Penney had knowledge
of or relied on the original technical information memo-
randum. We conclude that no facts supporting an estop-
pel theory have been established.

J.C. Penney and *amicus* argue that imposition of the
use tax on preprints violates the first amendment guar-
antees of free speech and freedom of the press. Their
argument is based on *Grosjean v. American Press Co.,*
297 U.S. 233 (1936), in which the Supreme Court de-
clared a license tax on newspaper advertising revenues
to be unconstitutional. The *Grosjean* court reviewed the
history of taxes based on advertising revenues and cir-
culation, and determined that they often amounted to a
prior restraint on publication. In striking down the tax
statute, the Court made clear that its decision was lim-
ited to the particular form of taxation under review.

It is not intended by anything we have said to suggest
that the owners of newspapers are immune from any of
the ordinary forms of taxation for support of the govern-
ment. But this is not an ordinary form of tax, but one
single in kind, with a long history of hostile misuse
against the freedom of the press.

*Grosjean,* 297 U.S. at 250.

The use tax at issue has no direct effect upon newspa-
pers. It is levied on J.C. Penney's use of tangible person-
al property in the State of Wisconsin. The tax is payable
by J.C. Penney. It is not imposed on a newspaper or its
advertising revenue. No evidence of record suggests that
newspapers will lose a significant amount of revenue as
the result of the use tax on preprints.

J.C. Penney has a constitutionally protected interest
in its commercial speech. *See, e.g., Metromedia Inc. v.
San Diego,* —— U.S. ——, 69 L. Ed. 2d 800, 813–14 (1981).

The use tax is content neutral. It applies to all nonexempt tangible personal property without regard for its communicative content. J.C. Penney cites no authority for the proposition that a content-neutral tax on preprints violates a merchandiser's right to free expression. We find no constitutional barrier to levying the use tax on J.C. Penney's preprints.

*By the Court.*—Order affirmed in part, reversed in part, and remanded for entry of an order consistent with this opinion.