A95A1409. COLLINS v. J. C. PENNEY COMPANY, INC.
(461 SE2d 582)

JOHNSON, Judge.

J. C. Penney Company, Inc., brought an action against Marcus E. Collins, Sr., Commissioner of the Georgia Department of Revenue, seeking a refund of assessed use taxes and interest. The Department appeals from the trial court's grant of summary judgment in favor of Penney. The Department's appeal is properly before this court. *Collins v. AT&T*, 265 Ga. 37 (456 SE2d 50) (1995). Because we find that the law of Georgia supports the Department's assessment of use taxes and interest against Penney, we reverse.

In October 1989, the Department conducted a sales and use tax audit of Penney for the period October 1985 through December 1988. Following that audit, the Department assessed Penney $893,162 in use taxes as well as $257,828 in accrued interest. This assessment resulted from the treatment of certain direct mail advertising materials and newspaper inserts as tangible personal property within the provisions of Georgia's use tax statute. Penney conceded the propriety of the Department's imposition of use taxes on a portion of those newspaper inserts which were distributed as "store copies" but filed a Petition for Redetermination for the remaining $1,006,837 in use taxes and interest, which the Department denied. Penney paid the full $1,150,990 in assessed use taxes and interest in November 1989. Shortly thereafter, Penney filed a Claim for Refund, which the Department also denied. Finally, Penney filed the present action for this same refund in Fulton County Superior Court pursuant to OCGA § 48-2-35 (b) (4).

The trial court considered the parties' cross-motions for summary judgment based upon the following stipulated facts. Penney is a Dela-

ware corporation qualified to conduct business in Georgia. In the furtherance of its business, Penney advertises its merchandise in numerous ways, two of which are the subject of this action: direct mail advertisements, comprising catalogs and monthly billing notice tear-offs and inserts; and advertising circulars, which are inserted into newspapers. The planning, layout and design for all of these materials were conducted in either Dallas or New York. Penney paid printers located outside of Georgia to produce both the direct mail materials and newspaper inserts. Penney had the printers deliver these materials to Georgia residents and newspapers by common carrier or the United States Postal Service. Penney paid no sales or use tax on any of these materials in the state where they were produced.

Regarding the direct mail materials, Penney supplied to the printers the names and mailing addresses to which catalogs and billing notice tear-offs and inserts were sent. The residents selected by Penney to receive these catalogs were previous customers who had purchased more than a designated dollar amount of merchandise. The billing notice tear-offs and inserts accompanied the monthly billing statements mailed to holders of Penney's credit cards.

Regarding the newspaper inserts, Penney directed the printers to send most of these materials to specific newspapers in Georgia with which Penney had contracts. Some portion of the inserts produced was delivered directly to Penney's retail stores to be distributed as "store copies." Once the printers delivered the inserts to the United States Postal Service or common carrier, title transferred to Penney. Title to these materials remained with Penney even after they were delivered to the newspaper publishers. Penney had control over the date on which the inserts were included in the newspapers and could elect to have the inserts included in newspapers going only to particular geographic zones. Also, at Penney's request, the newspaper publishers could have removed the inserts from the newspaper after insertion up until the point that the newspapers "hit the streets."

In addition to insertion into newspapers, the inserts were distributed by separate mailings and as part of groupings of similar advertising materials. As noted, Penney has conceded for the purposes of this litigation that all of the newspaper inserts distributed other than with a newspaper were properly taxed. Penney had these inserts distributed between 36 and 42 times per year during the audit period. Finally, no newspaper publisher copyrighted the inserts, and only the Atlanta Journal-Constitution microfilmed the inserts for inclusion in its historical record.

The relevant portion of Georgia's use tax statute provides that "[u]pon the first instance of use, consumption, distribution, or storage within this state of tangible personal property purchased at retail outside this state, the owner or user of the property shall be a dealer

and shall be liable for a tax at the rate of 3 percent of the cost price or fair market value of the property, whichever is lesser." OCGA 48-8-30 (c).[1] "Use" is defined as "the exercise of any right or power over tangible personal property incident to the ownership of the property. . . ." OCGA § 48-8-2 (12). "Use tax," however, is defined to include not only the "use," but also the "consumption, distribution, and storage of tangible personal property. . . ." OCGA § 48-8-2 (13). Also relevant is Georgia's definition of "retail sale" as being a sale "for any purpose other than for resale. . . ." OCGA § 48-8-2 (6) (A).

The trial court concluded that Penney did not exercise sufficient right or power over the direct mail advertising materials such that Penney could be said to have used those materials in Georgia within the statutory definition. The trial court further concluded that the advertising inserts became an integral component of the newspaper itself, were resold as part of the newspaper and, therefore, were not purchased by Penney "at retail." The Department appeals these rulings.

## Direct Mail Advertisements

1. The Department argues that the issue of whether direct mail advertisements are subject to use tax is controlled by *L. M. Berry & Co. v. Blackmon*, 231 Ga. 659 (203 SE2d 520) (1974), and that the trial court erred in distinguishing this case. As discussed later in this division, we agree with the Department that the trial court's interpretation of *L. M. Berry & Co.* is incorrect. But we find that the unambiguous terms of Georgia's use tax statute more expediently dispose of this issue. Both OCGA §§ 48-8-30 (c) and 48-8-2 (13) use the word "distribution." Although every tax statute "must be construed liberally in favor of the taxpayer," *Telecom\*USA v. Collins*, 260 Ga. 362, 364 (1) (393 SE2d 235) (1990), the use tax statute explicitly makes "distribution" a distinct and independent basis for imposing the use tax. When a word in a statute is not defined, that word should be given its commonly understood meaning. OCGA § 1-3-1 (b); *Oxford v. Chance*, 104 Ga. App. 310, 313 (121 SE2d 825) (1961). Webster's Third New International Dictionary defines "distribution" as meaning "the spreading out or scattering over an area or throughout a space . . . [or] delivery or conveyance (as of newspapers or goods) to members of a group. . . ." It is clear in this case that Penney distributes the direct mail advertising materials through its agent, the printer, to residents of Georgia in order to further its merchandising business.

---

[1] This section was amended in 1989 increasing the tax to four percent of the cost or fair market value of the property.

Penney's argument that only the "use" of the property as defined in OCGA § 48-8-2 (12) will support an assessment of use taxes is simply inconsistent with the plain language of the statute. While the word "use" may be ambiguous and in need of definition, "use" is only one of four activities that gives rise to tax liability under the use tax statute. If the legislature had intended that the use tax statute be applied in the manner urged by Penney, it would have been unnecessary to explicitly include "consumption, *distribution, or* storage . . ." in the definition of "use tax" and in the use tax enabling statute. OCGA §§ 48-8-2 (13); 48-8-30 (c). "All the words of a statute are to be given due weight and meaning. [Cit.]" *Undercofler v. Colonial Pipeline Co.*, 114 Ga. App. 739, 742 (152 SE2d 768) (1966).

Moreover, the Department's assessment of the use tax against Penney comports with the purpose of the use tax statute as articulated in *L. M. Berry & Co.*, supra. "Georgia's statutory scheme for levying and collecting sales and use taxes presents a comprehensive plan to assure fairness in that items purchased and used in Georgia bear no higher tax burden than items purchased elsewhere and used in Georgia. Protections are afforded to those items on which sales tax has been paid elsewhere." Id. at 660 (1). Georgia's use tax is thus a compensating tax designed to preclude the avoidance of sales tax. *Independent Publishing Co. v. Hawes*, 119 Ga. App. 858, 861 (168 SE2d 904) (1969). Had Penney used printers in Georgia to produce these direct mail materials for delivery to Georgia residents, we have no doubt that Penney would have owed sales tax on the price of these materials. Allowing Penney to avoid both sales tax and use tax by purchasing the direct mail advertising materials outside of Georgia and then distributing them inside Georgia is contrary to the purpose of the use tax as a compensating tax. See *L. M. Berry & Co. v. Blackmon*, supra at 661 (1). If we were to accept Penney's argument, its direct mail materials would escape taxation altogether.

We do not read the specific holding in *L. M. Berry & Co.* as requiring a different result. In *L. M. Berry & Co.*, the Supreme Court considered whether an Ohio corporation that supplied telephone directories printed outside the state to resident telephone subscribers in Georgia was liable for use taxes on the cost of printing those directories. As with this case, the tangible property at issue was produced by third-party printers. The Supreme Court of Georgia affirmed the decision of both the trial court and the Court of Appeals in finding that the assessment of use taxes against the taxpayer was proper.

In distinguishing *L. M. Berry & Co.* from the instant case, the trial court focused on the definition of "use" as requiring the exercise of a "right or power over tangible personal property incident to the ownership. . . ." OCGA § 48-8-2 (12). The trial court then relied on the existence of the contractual obligations requiring the taxpayer in

*L. M. Berry & Co.* to deliver the directories into Georgia as the basis for the taxpayer's "right or control" over the property in that case. The trial court read *L. M. Berry & Co.* as applying only to the narrow circumstances of that case and, therefore, held that the absence of contractual obligations requiring Penney to deliver direct mail materials to Georgia residents distinguished the case before us now from *L. M. Berry & Co..*

We respectfully disagree that *L. M. Berry & Co.* must be so limited. Even if *L. M. Berry & Co.* is read as requiring that the taxpayer "use" the property as defined by OCGA § 48-8-2 (12), rather than "distribute" the property, we do not believe that contractual obligations are the exclusive measure of whether a taxpayer has made "use" of the property. Certainly, *L. M. Berry & Co.* does not suggest that contractual obligations are the only basis for finding an "exercise of right or control incident to ownership . . ." of tangible personal property. Instead, we agree with the reasoning employed in a case from Louisiana involving very similar circumstances to those involved here. In *D. H. Holmes Co. v. McNamara*, 486 U. S. 24 (108 SC 1619, 100 LE2d 21) (1988), the United States Supreme Court stated that, "[the taxpayer's] contention that it lacked sufficient control over the catalogs' distribution in Louisiana to be subject to the use tax verges on the nonsensical. [The taxpayer] ordered and paid for the catalogs and supplied the list of customers to whom the catalogs were sent." Id. at 32 (2). We recognize that the Supreme Court was considering a Commerce Clause challenge to the use tax rather than construing Louisiana's use tax statute; however, its logic is directly applicable and persuasive. Penney designed, ordered and paid for the direct mail materials and supplied to the printers all of the instructions and addresses for distributing them. Clearly, Penney exercised right or power over these materials.

Finally, we note that Penney asks this court to interpret the use tax statute in a manner that would place Georgia alone among states with similarly worded statutes. See, e.g., *J. C. Penney Co. v. Olsen*, 796 SW2d 943 (Tenn. 1990); *McNamara v. D. H. Holmes Co.*, 505 S2d 102 (La. Ct. App. 4th Cir. 1987) (same case considered by the United States Supreme Court, aff'd on other grounds). Indeed, even courts in states with use tax statutes less broadly worded than Georgia's have upheld use tax assessments against similar direct mail advertising materials. See, e.g., *Comfortably Yours v. Director, Div. of Taxation*, 1992 N.J. Tax LEXIS 22 (1992), aff'd 272 N.J. Super. 540 (640 A2d 862) (App. Div. 1994).

Penney's direct mail advertising materials fall squarely within the intent and provisions of the Georgia use tax statute and were properly taxed. The decision of the trial court exempting the payment of the use tax on the direct mail advertising materials must be

reversed.

### Preprinted Newspaper Inserts

2. The Department argues that the trial court erred by holding that the preprinted newspaper inserts become a component of the newspapers into which they are inserted, that the inserts are resold as part of the newspaper and, therefore, that Penney does not purchase the inserts "at retail" as required by the use tax statute. OCGA § 48-8-30 (c). Again, we agree with the Department.

Although the question of these preprinted newspaper inserts presents an issue of first impression in Georgia, we are not without assistance from numerous other jurisdictions. Authority from the courts of these other states is divided on whether the inserts become a component or integral part of the newspaper. Courts in Alabama, Missouri, Kansas and Massachusetts have held that these inserts do become a component or integral part of a newspaper. See, e.g., *Eagerton v. Dixie Color Printing Corp.*, 421 S2d 1251 (Ala. 1982); *Daily Record Co. v. James*, 629 SW2d 348 (Mo. 1982); *In re Appeal of K-Mart Corp.*, 238 Kan. 393 (710 P2d 1304) (1985); *Sears, Roebuck & Co. v. State Tax Comm.*, 370 Mass. 127 (345 NE2d 893) (1976). In contrast, courts in Arizona, Connecticut, Arkansas, Wisconsin, South Dakota, Tennessee and Vermont have held that inserts do not become part of the newspapers into which they are inserted. See, e.g., *Mervyn's v. Ariz. Dept. of Revenue*, 173 Ariz. 644 (845 P2d 1139) (Ariz. Tax Ct. 1993); *Caldor v. Heffernan*, 183 Conn. 566 (440 A2d 767) (1981); *Ragland v. K-Mart Corp.*, 274 Ark. 297 (624 SW2d 430) (1981); *Wis. Dept. of Revenue v. J. C. Penney Co.*, 108 Wis.2d 662 (323 NW2d 168) (Ct. App. 1982); *K-Mart Corp. v. S. D. Dept. of Revenue*, 345 NW2d 55 (S.D. 1984); *Sears, Roebuck & Co. v. Woods*, 708 SW2d 374 (Tenn. 1986); *Hannaford Brothers Co. v. Vt. Dept. of Taxes*, 150 Vt. 6 (547 A2d 1353) (1988).

Those courts finding that inserts are not a component of a newspaper have generally employed similar reasoning. *Caldor v. Heffernan*, supra. This reasoning is perhaps best articulated in *Ragland v. K-Mart*, supra at 432 (1), where the Arkansas Supreme Court classified six factors that supported its conclusion that inserts do not become a component of the newspaper: (1) ownership — the taxpayer purchased the inserts and retained title until the newspapers were delivered to customers; (2) preparation — the inserts were prepared by an independent third party, not the newspaper publisher; (3) regularity of insertion — the advertising inserts did not appear with sufficient regularity; (4) privity of contract — the taxpayer paid the newspaper to carry the inserts; whereas, the newspaper publisher paid for the right to insert the comics, etc.; (5) "supplement to" — the inserts

carried a heading that specifically identified them as supplemental; and (6) distribution — the inserts were distributed in numerous other ways besides via newspapers.

We note generally that at least five of the six factors identified in *Ragland* are satisfied in this case. Specifically, the factors designated as ownership, preparation, regularity of insertion, privity of contract and distribution are all clearly present. We believe that the line of cases following *Caldor* and *Ragland* represents the better reasoned and more persuasive position, and we hold that advertising inserts do not become a component of the newspaper and are not resold within the meaning of OCGA § 48-8-2 (6) (A).

In addition, the following facts, to which the parties in this case have stipulated, further demonstrate that these inserts are not essential components of a newspaper. Penney purchased the preprinted inserts from the printer and then paid various newspapers to distribute those inserts. In addition to distribution through newspapers, the inserts were also distributed separately, both through alternative methods available from the newspaper publishers and as store copies. Penney has conceded that all inserts distributed using these alternative methods were properly taxed. Instead of becoming part of the newspaper, as Penney urges, the numerous distribution methods demonstrate that the inserts are distinct and separate items used to promote Penney through a variety of channels.

We do not accept Penney's argument that these same inserts, which it gives away free as store copies and which it pays newspapers to mail free of charge to potential customers as part of these alterative distribution methods, are resold merely because they are distributed with the newspapers. The inserts distributed with the newspapers can be "zoned" so that they do not appear in every paper on the date of distribution, a decision made by Penney. The cost of the newspaper on the date the inserts are distributed does not vary based on whether or not the preprinted inserts are included and does not vary between days on which inserts are distributed and days on which they are not. Both of these facts suggest that the price paid by purchasers of the newspapers does not include any increase for the inserts and undermine Penney's contention that its inserts were resold.

Ironically, not only does the purchase price of the newspapers not include any increase due to the inclusion of the inserts, as one would expect if the inserts were truly being resold, but the record in this case demonstrates that the price is actually decreased by the presence of these inserts. Newspaper publishers charge retailers such as Penney for the service of distributing these inserts, and the revenue thus generated helps defray the cost of publishing the newspapers. Were it not for the revenue from the distribution of these inserts, newspapers would cost more to consumers.

We believe there is an important basis for distinguishing these inserts from those portions of the newspaper such as the comics and Parade magazine which are also preprinted by third parties in other states and then purchased by the newspaper publishers for inclusion in various newspapers to strengthen the quality of the product they sell to the public. In contrast, Penney pays the newspaper publishers to insert the advertising materials in order to take advantage of the newspaper's distribution network. If Penney must pay the newspaper publisher to include the inserts, then clearly the newspaper publishers do not consider the inserts to be an essential part of their product. Otherwise, one would expect to find the publishers purchasing the advertising inserts to strengthen the quality of their product.

We also disagree with Penney's contention that its inserts should be treated in the same manner as what are commonly called "real estate tabs" (tabs). As indicated in the stipulation of facts, newspaper publishers sell space in the tabs, and the tabs are produced on the newspaper publishers' presses, not those of third-party printers, using the same quality of paper and print as ordinary newsprint. We view these tabs as more akin to advertising space on the actual pages of the newspapers. Advertising space within the pages of the newspaper is exempt from sales and use tax under Georgia Department of Revenue Rules & Regulations, Rule 560-12-2-.02 (5).

Ultimately, this issue turns on the character of the relationship between the preprinted inserts and the newspapers through which they are distributed. While the inserts may frequently be *associated* with newspapers in the minds of the public, the inserts do not become *components or integral parts* of the newspapers.

Therefore, we hold as a matter of law that the preprinted inserts are not, and do not become, a component or integral part of the newspapers through which they are distributed. The trial court's ruling on this issue is, therefore, reversed.

*Judgment reversed. Birdsong, P. J., and Smith, J., concur.*

DECIDED AUGUST 25, 1995 —

*Michael J. Bowers, Attorney General, Daniel M. Formby, Warren R. Calvert, Senior Assistant Attorneys General,* for appellant.

*Smith, Gambrell & Russell, E. Kendrick Smith, William B. Wood, Thomas M. Barton,* for appellee.