## MORTON BUILDINGS, INC. *vs.* COMMISSIONER OF REVENUE.

No. 96-P-295.

Suffolk. April 18, 1997. - August 28, 1997.

Present: PERRETTA, GILLERMAN, & KASS, JJ.

*Taxation,* Sales and use tax, Abatement. *Statute,* Construction.

The Appellate Tax Board correctly concluded that the raw materials used in building components, prefabricated outside of Massachusetts and used in the construction of buildings in Massachusetts, are not subject to the use tax, G. L. c. 64I, § 2, where the raw materials had been converted into components, of a different nature and not subject to the sales or use tax, distinct from the ingredients. [444-446]

APPEAL from a decision of the Appellate Tax Board.

*Leo T. Sorokin,* Assistant Attorney General, for the Commissioner of Revenue.

*Abraham M. Stanger* of New York (*Richard Brunell* with him) for the taxpayer.

KASS, J. Are the raw materials, e.g., lumber and steel, used in building components prefabricated outside of Massachusetts and used in the erection of buildings in Massachusetts subject to the use tax, G. L. c. 64I, § 2? The Appellate Tax Board decided that they are not, and from that decision the Commissioner of Revenue has appealed. We affirm.

Morton Buildings, Inc. (Morton), incorporated under Illinois law and with its principal office in that State, manufactures, sells, and erects prefabricated, timber-frame, metal-sheathed structures, most often warehouses, for agricultural and industrial use. At the time the case was presented in the Appellate Tax Board, Morton was active in thirty-eight States. A customer order begins with a choice of one of the basic models Morton makes, as to which the customer may opt to add windows, extra doors, sliding doors, and overhangs, located where the buyer wants them. Morton has factories spotted around the country.

Orders for Massachusetts are filled by factories that Morton operates in Kenton, Ohio and Gettysburg, Pennsylvania.

What Morton delivers to a customer is a completed building that becomes attached to the customer's land, i.e., it is real estate and, as such, not subject to the sales or use tax. Those taxes deal with tangible personal property and in the case of a building, if sales or use taxes are to be paid, they are paid by the supplier and installer — often a contractor — of the building. See generally Hellerstein & Hellerstein, State Taxation par. 15.07[1] & n.135 (1992).

The use tax, assessed in Massachusetts under G. L. c. 64I, § 2, as amended by St. 1976, c. 415, § 79, imposes

> "an excise . . . upon the storage, use or other consumption in the commonwealth of tangible personal property purchased from any vendor for storage, use or consumption within the commonwealth at the rate of five per cent of the sales price of the property. . . . "

A purpose of the use tax is to make it futile to attempt to avoid the Massachusetts sales tax (imposed by G. L. c. 64H, § 2) by buying a product in a State where there is no sales tax. The use tax is complementary to the sales tax and bites when the sales tax does not. It would be pointless, for example, to buy in New Hampshire to avoid the sales tax a refrigerator that will be used in a Massachusetts house. The use tax will come into play. See *Boston Tow Boat Co.* v. *State Tax Commn.*, 366 Mass. 474, 477 (1974); *M & T Charters, Inc.* v. *Commissioner of Rev.*, 404 Mass. 137, 140 (1989). "The use tax was designed to prevent the loss of sales tax revenue from out-of-State purchases." *Ibid.*

During the years in controversy, 1984-1987, Morton paid $329,981.74 in use taxes, which it asked the commissioner to abate. More refined calculations developed that of that amount 16.6124% was allocable to windows, doors, hardware, and certain raw materials that Morton bought outside of Massachusetts and installed in Massachusetts jobs without significant alteration. Those products, Morton conceded, were subject to the use tax. The net amount in controversy became $275,163.85.

How Morton goes about its business in manufacturing and installing buildings was the subject of a statement of agreed facts. Both the Appellate Tax Board and we, therefore, confront a pure question of statutory interpretation and application in the

light of the stipulated facts. See *Commissioner of Rev.* v. *Houghton Mifflin Co.*, 423 Mass. 42, 42-43 (1996).

Morton buys its raw materials, notably lumber and steel, in bulk outside of Massachusetts and stores them in warehouses outside of Massachusetts. Those purchases are not made for a particular job but on estimates of the volume of business Morton is likely to be doing in the area served by the regional factories. When Morton receives an order for a building, it draws materials from storage and proceeds to make building components such as trusses, lower columns, upper columns, purlins, metal panels, and overhang rafters. The stipulation details how Morton makes each category of component. One illustration suffices:

> "To make the trusses, the upper chords and lower chords that will form the truss are run through a machine which cuts the chords to the proper lengths and to the proper angles at both ends of each chord. Lumber webbing, which is attached between the upper and lower chords, is also cut to length and to the correct angles. The trusses (chords and webs) are then transferred to a fixture table where they are positioned 'face-up' and metal gusset plates, themselves made by Morton from rolled steel that it purchased, are positioned at each joint. The gusset plates are then stitched into position with a pneumatic gun nailer. The truss is then positioned onto a conveyer and transported through a roller press machine. The roller press machine imbeds the metal gusset plates onto the wooden chords and webs at the preselected positions. The trussses include end trusses and intermediate trusses."[1]

After completing the building components, Morton transports them and any specialty items directly to the building site for erection. Generally it takes a three-person crew from three to five days to complete a building. Employees of Morton or, in some instances subcontractors that Morton hires, perform all of the transportation, loading, unloading, and erection work.

Several principles that govern decision-making in tax cases warrant mention. The commissioner's authority to tax must rest

---

[1] In the interest of clarity and uniformity of style, we have adjusted some tenses and eliminated some capitalizations that appear in the original of the material quoted.

on an express statutory source. *DiStefano* v. *Commissioner of Rev.*, 394 Mass. 315, 325-326 (1985). To the extent a taxing statute raises interpretive questions, doubts are to be resolved in favor of the taxpayer. *Dennis* v. *Commissioner of Corps. & Taxn.*, 340 Mass. 629, 631 (1960). *Commissioner of Rev.* v. *AMIWoodbroke, Inc.*, 418 Mass. 92, 94 (1994). The taxpayer, however, carries the burden of establishing entitlement to an abatement. *Towle* v. *Commissioner of Rev.*, 397 Mass. 599, 603 (1986).

Broken down to its components, the use tax falls on tangible personal property that (1) is stored, used or otherwise consumed in the Commonwealth; (2) is purchased from any vendor; and (3) was purchased for storage, use, or consumption within the Commonwealth. Obviously, the building components — trusses, columns, panels, etc. — are used in Massachusetts.[2] But, as the Commissioner concedes, Morton did not purchase the building components; it made them. As the building components, therefore, are not subject to the use tax, the commissioner seeks to tax what they are made of: lumber, steel, nails, etc.

The commissioner argues that the raw materials, which Morton bought out-of-State, are but lightly transformed when they appear in Massachusetts as building components. Using the lower columns as an example, the commissioner writes in his brief that "[t]he lumber that Morton brought to Massachusetts as a [l]ower [c]olumn is the lumber Morton purchased connected to nails minus the lumber cut off or drilled out during fabrication. Even though the lumber and nails become part of the [l]ower [c]olumn they each retained a distinct physical existence and are subject to the use tax." The same argument might be applied to a computer component made by a computer maker in Arizona and inserted into a computer in an assembly operation in Massachusetts. The steel, wire, and microchips retain a certain preexisting physical existence.

That is exactly the point, warns the commissioner. Failing to levy a use tax on underlying materials transformed out-of-State opens up a big loophole in the sales tax/use tax system. It is not a wholly untenable position, having been adopted, for example, by the Supreme Court of Minnesota in *Morton Bldgs., Inc.* v.

---

[2] The word "use" is defined by G. L. c. 64I, § 1(5), as appearing in St. 1967, c. 757, § 2, as "the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it does not include the sale of that property in the regular course of business."

*Commissioner of Rev.*, 488 N.W.2d 254, 258 (Minn. 1992), which wrote that, "[d]espite their alteration at the factories, the raw materials are still tangible personal property used in Minnesota as parts of Morton's prefabricated buildings." See also In re Morton Bldgs., Inc., State Board of Equalization No. A-88-150, (Wyo. Apr. 4, 1990).

We think that view asks too much from the language of the statute. One could not disassemble a truss and have recognizable lumber, steel, and nails to be used or consumed in Massachusetts. This has been the view of the majority of States that have considered the question. Those jurisdictions have granted a use tax abatement because the conversion of raw materials into components, property distinct from its ingredients, excludes the raw materials from levy of the use tax. See *Morton Bldgs., Inc. v. Bannon*, 222 Conn. 49, 61 (1992) (statute very similar to Massachusetts statute); Morton Bldgs., Inc. v. Missouri Dept. of Rev., Administrative Hearing Commn. No. 88-001879RZ (Mo. Dec. 8, 1989); *Morton Bldgs., Inc. v. Chu*, 126 A.D. 2d 828, 830 (1987), aff'd, 70 N.Y.2d 725 (1987); Sharp v. Morton Bldgs., Inc., Ct. App. No. 03-96-00458-CV 1997 (Tex. June 19, 1997); Morton Bldgs., Inc. v. Wisconsin Dept. of Rev., Tax App. Commn. No. 89-S-438 (Wis. July 26, 1991). See also, in other contexts, *Comptroller of Treasury* v. *American Can Co.*, 208 Md. 203 (1955) (raw materials converted into tangible personal property of a different nature not subject to use tax); *International Bus. Machs. Corp. v. David*, 408 S.W.2d 833, 836 (Mo. 1966) (use tax not applicable to business machines manufactured out-of-State and used in State because not purchased out-of-State; raw materials not subject to use tax because not identifiable as such).

We are of opinion that the building components of its own manufacture that Morton brought into Massachusetts so significantly altered the raw materials that those raw materials do not come within the reach of G. L. c. 64I, § 2, as written. Two States, Connecticut and Minnesota (the latter before its Supreme Court reversed its Tax Court) have by legislative amendment closed the loophole that Morton has found and that the Massachusetts Commissioner of Revenue understandably laments. See Conn. Gen. Stat. Ann. § 12-411(1) (West 1993), applying the use tax to "the storage, acceptance, consumption or any other use in this state of tangible personal property which has been manufactured, fabricated, assembled or processed

from materials by a person, either within or without this state," and Minn. Stat. Ann. § 297A.14 (West Supp. 1997), imposing a use tax on "every person who uses, stores, distributes, or consumes tangible personal property in Minnesota which has been manufactured, fabricated, or assembled by the person from materials, either within or without this state." Adoption of similar language is open to our Legislature. The principles of intepretation of tax statutes previously adverted to preclude us from, in effect, engrafting such language on the statute as written.

The decision of the Appellate Tax Board granting Morton an abatement in the amount of $275,163.85 is affirmed.

*So ordered.*