AMERITECH PUBLISHING, INC v DEPARTMENT OF TREASURY

Docket No. 276374. Submitted June 5, 2008, at Lansing. Decided August 7, 2008. Approved for publication September 30, 2008, at 9:00 a.m.

Ameritech Publishing, Inc., brought an action in the Court of Claims against the Department of Treasury, seeking a use tax refund for the years 1998 through 2000 after the defendant denied a refund request. The use tax had been assessed with regard to telephone directories published by the plaintiff. The directories were printed by a company in Illinois on paper purchased by the plaintiff outside Michigan. The directories were then transported by a carrier under contract with the plaintiff, were delivered to distribution centers located in Michigan, and were then distributed to businesses and residents by a company under contract with the plaintiff for such purposes. The Court of Claims, Paula J. Manderfield, J., upheld the denial of a refund, ruling that the plaintiff used the directories in Michigan for purposes of taxation under the Use Tax Act, MCL 205.91 *et seq.*, and that the price of the directories was properly calculated without deduction for the costs of the paper or the printing services. The Court of Claims also determined that the costs of the directories had not been subjected to double taxation. The plaintiff appealed.

The Court of Appeals *held*:

1. The Use Tax Act defines "use" as the exercise of a right or power over tangible personal property incident to the ownership of that property, including transfer of the property in a transaction where possession is given to another. MCL 205.92(b). A distribution of tangible personal property is a "use" subject to the Use Tax Act if the owner of the property exercises a right or power incident to the ownership of that property while the property is distributed in Michigan. The plaintiff did not cede total control of the directories while they were transported and distributed in Michigan. Therefore, the plaintiff used the directories in Michigan and that use was subject to the use tax.

2. The cost of the paper and the printing services were properly included in the price of the directories. The use tax was not imposed directly on the printing services provided by the out-of-state printer. Rather, the cost of the printing services and the

paper were properly used as part of the measure of the use tax imposed for the use of the directories in Michigan.

3. The paper and the printing services were properly included in the aggregate value of the transaction of producing the directories for purposes of determining the use tax amount.

4. The plaintiff's costs in producing the directories was not subjected to double taxation.

Affirmed.

*Jaffe, Raitt, Heuer & Weiss, PC* (by *Brian G. Shannon* and *Robert E. Lewis*), for the plaintiff.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Michael R. Bell*, Assistant Attorney General, for the defendant.

Before: GLEICHER, P.J., and FITZGERALD and HOEKSTRA, JJ.

PER CURIAM. Plaintiff Ameritech Publishing, Inc. (API), appeals as of right the Court of Claims order affirming the denial of API's request for a use tax refund for the years 1998 through 2000 (the refund period) by defendant Department of Treasury (the Department). Because API "used" the telephone directories in Michigan and the "price" of the directories is to be calculated without a deduction for the costs of materials or services, and because the costs of the directories is not subject to double taxation, we affirm.

I. FACTS AND PROCEDURAL BACKGROUND

API[1] and the Department submitted the case to the Court of Claims on the following stipulated facts. API published and distributed telephone directories to busi-

---

[1] API is a subsidiary of Ameritech Corporation, and Ameritech Corporation is a subsidiary of AT&T, Inc.

ness and residential customers in Michigan. R.R. Donnelly & Sons Company (Donnelly) printed, bound, and cut the directories at its printing facility in Dwight, Illinois.

The publishing of the directories involved three steps. First, API developed the content to be published in the directories. After API completed creating the content, which consisted of a page-by-page presentation of the directories, API provided the content to Donnelly in electronic format. Second, API purchased the paper on which Donnelly was to print the directories. API entered into contracts with non-Michigan paper mills for the paper. Although the paper mills shipped the paper directly to Donnelly's printing facility in Dwight, Illinois, API took title of the paper before Donnelly used the paper to print any directories. Donnelly maintained API's paper separate from all other paper in its plant, and it was only allowed to use API's paper for the directories. Third, API procured printing services from Donnelly. After Donnelly printed the content supplied by API on the paper, Donnelly cut and bound the paper into finished directories.

API entered into an agreement with a contract carrier for transportation of the directories (carrier contract) and with a product development corporation (PDC) for distribution of the directories (distribution contract). The contract carrier transported the finished directories from Donnelly's printing facility in Dwight, Illinois, to the PDC's distribution centers located throughout Michigan. Then, over the course of several weeks, the PDC distributed the directories to local businesses and residences. In general, the PDC's distribution of the directories consisted of two phrases: (1) the "initial distribution," where the PDC completed door-to-door distribution of the directories and mailed

directories to remote and rural areas and to controlled-access locations, such as condominium complexes and gated communities; and (2) the "secondary distribution," which consisted, in part, of the PDC's delivering directories to new telephone users and to customers requesting additional directories.

During the refund period, API remitted use tax to the Department based on the cost of the paper it purchased from the paper mills and the cost of Donnelly's printing services. In February 2002, API sought from the Department a refund in the amount of $3,519,409.13, which equaled the amount of use taxes it alleged it had overpaid during the refund period. The Department denied the refund request, and the Court of Claims upheld the denial.

On appeal, API makes three arguments. First, API argues that, because it exercised no rights or powers over the directories while the directories were in the distribution channel, it did not "use" the directories in Michigan. Second, API argues that, even if the distribution of the directories is subject to the use tax, neither the cost of the paper nor the cost of Donnelly's printing services could be included in determining the "price" of the directories. Third, API argues that, because the directories are a "tie-in" item to the telecommunication services provided by its affiliated companies, the result of allowing defendant to tax its costs of producing the directories would be double taxation.

## II. STANDARD OF REVIEW

This Court reviews questions of law de novo. *Gen Motors Corp v Dep't of Treasury*, 466 Mich 231, 236; 644 NW2d 734 (2002). This Court also reviews questions of

statutory interpretation de novo. *Herald Wholesale, Inc v Dep't of Treasury*, 262 Mich App 688, 693; 687 NW2d 172 (2004).

Construction of the Use Tax Act (UTA), MCL 205.91 *et seq.*, is subject to the general rules of statutory interpretation. *Brunswick Bowling & Billiards Corp v Dep't of Treasury*, 267 Mich App 682, 684; 706 NW2d 30 (2005). The primary goal of judicial construction of a statute is to ascertain and give effect to the intent of the Legislature. *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004). If the language employed by the Legislature is unambiguous, the Legislature is presumed to have intended the meaning clearly expressed, and this Court must enforce the statute as written. *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 219; 731 NW2d 41 (2007). However, when interpreting a tax statute, this Court must keep in mind that the authority to tax must be expressly provided. See *Molter v Dep't of Treasury*, 443 Mich 537, 543; 505 NW2d 244 (1993). Tax laws will not be extended in scope by implication or forced construction. *Sharper Image Corp v Dep't of Treasury*, 216 Mich App 698, 702; 550 NW2d 596 (1996). "When there is doubt, tax laws are to be construed in favor of the taxpayer." *Id.*

### III. THE UTA

The use tax is complementary to the sales tax. *WPGP1, Inc v Dep't of Treasury*, 240 Mich App 414, 416; 612 NW2d 432 (2000). The UTA is designed to cover those transactions not covered by the General Sales Tax Act (GSTA), MCL 205.51 *et seq. WPGP1, supra* at 416. The UTA provides:

> There is levied upon and there shall be collected from every person in this state a specific tax for the privilege of using, storing, or consuming tangible personable property

in this state at a rate equal to 6% of the price of the property . . . ." [MCL 205.93(1).][2]

"It is the use [of the property] in Michigan that is taxed under the [UTA]." *WMS Gaming, Inc v Dep't of Treasury*, 274 Mich App 440, 443; 733 NW2d 97 (2007).

### A. "USE"

The UTA defines "use" as "the exercise of a right or power over tangible personal property incident to the ownership of that property including transfer of the property in a transaction where possession is given" to another. MCL 205.92(b). API claims that, because it did not exercise any rights or powers over the directories while the directories were transported by the contract carrier and distributed by the PDC, it did not "use" the directories in Michigan. In addition, API argues that this Court's decision in *Sharper Image, supra*, suggests that a distribution of tangible personal property does not fall within the definition of "use" under MCL 205.92(b).

In *Sharper Image*, the plaintiff conducted business in Michigan through mail-order catalogs. The catalogs, produced by a printer in Nebraska, were shipped to Michigan residents through the mail from the printer's place of business. The plaintiff retained no control over the catalogs after the catalogs were delivered to the postal service. The Court of Claims held that the plaintiff's distribution of the catalogs in Michigan was a "use" subject to the UTA because it found that the definition of "distribution" was synonymous with the definitions of "give" and "transfer," two terms within the statutory definition of "use."

This Court disagreed:

---

[2] Throughout this opinion, we quote the UTA as it existed during the refund period. The UTA has been revised since the refund period.

We conclude the trial court erred in two respects. First, under the plain wording of the statute, in order to be taxed under the UTA, a taxpayer must perform in Michigan one of the activities listed in the definition of "use." MCL 205.93(1); MSA 7.555(3)(1). Here, plaintiff's exercise of a right or power over the catalogs ended when the catalogs were delivered to the postal service in Nebraska.

Second, we find no provision in the statutory definition of "use" to allow defendants to tax the distribution of catalogs. Had the Legislature intended for distributions to be taxed, it could have easily done so by expressly providing it in the definition of use. Indeed, the legislatures of other jurisdictions have done this. See, e.g., *Collins v J C Penney Co, Inc*, 218 Ga App 405; 461 SE2d 582 (1995), and *J C Penney Co, Inc v Olsen*, 796 SW2d 943 (Tenn, 1990).[3] Our Legislature, however, did not include distribution in the definition of use, and we will not extend the tax to that activity absent the statutory authority to do so. *Michigan Bell [Tel Co v Dep't of Treasury*, 445 Mich 470, 477; 518 NW2d 808 (1994)].

\* \* \*

We find support for our conclusion from a review of case law from other states. The cases from states in which a use tax has been applied in situations similar to that presented here are dissimilar in two important ways. First, in many of the other jurisdictions, the relevant statute specifically provides for the taxation of distributions. See, e.g., *Collins, supra*, and *Olsen, supra*.

Also, the facts before the courts in the other jurisdictions indicated that the taxpayer enjoyed indicia of control

---

[3] The Georgia use tax enabling statute provides "that '[u]pon the first instance of use, consumption, *distribution*, or storage within this state of tangible personal property . . . the owner . . . shall be liable for a tax . . . .' " *Collins, supra* at 406-407, quoting Ga Code Ann 48-8-30(c) (emphasis added). The Tennessee use tax statute applies to tangible personal property " 'when the same is not sold but is used, consumed, distributed, or stored for use or consumption in this state . . . .' " *J C Penney Co, supra* at 945, quoting Tenn Code Ann 67-6-203 (emphasis added).

over the material not here present. Such indicia of control included the power to determine in what publications the advertisements were to be placed and at what time they would be distributed. See *Mervyn's v Arizona Dep't of Revenue*, 173 Ariz 644; 845 P2d 1139 (1993), and *K Mart Corp v Idaho State Tax Comm*, 111 Idaho 719; 727 P2d 1147 (1986).

In those jurisdictions having statutory language similar to that in Michigan, and applying that language to facts similar to those presented here, the use tax has been held inapplicable. See, e.g., *Modern Merchandising, Inc v Dep't of Revenue*, 397 NW2d 470 (SD, 1986), and *Wisconsin Dep't of Revenue v J C Penney Co, Inc*, 108 Wis App 2d 662; 323 NW2d 168 (1982). Indeed, many of the courts addressing this issue rely on the distinction between those companies exercising control over their mailings and those not exercising such control. See, e.g., *Modern Merchandising, supra*, and *Mervyn's, supra*. [*Sharper Image, supra* at 702-704.]

We disagree with API's assertion that the Court's holding in *Sharper Image* suggests that a distribution of tangible personal property can never be a taxable "use" of the property under the UTA. In *Sharper Image*, the Court's holding that the plaintiff's distribution of the catalogs in Michigan was not subject to a use tax was two-fold: (1) the plaintiff did not exercise "a right or power" over the catalogs in Michigan, and (2) the Legislature did not include distributions within the list of activities subject to the UTA. *Id.* at 702-703. On the basis of the first part of the Court's holding, we conclude that under MCL 205.92(b) a distribution of tangible personal property is a "use" subject to the UTA if the owner of the property exercised "a right or power . . . incident to the ownership of that property" while the property was in Michigan.[4]

---

[4] See *K Mart Corp, supra* at 721 ("In light of . . . the exercise by K Mart, through its contracts, of rights and powers over the inserts incident to their ownership, K Mart uses the inserts within the meaning of the use tax statute.").

An owner of tangible personal property no longer exercises "a right or power over tangible personal property incident to the ownership of that property" when it has ceded total control of the property to a third party. *WPGP1, supra* at 418-419. In *WPGP1*, the plaintiff purchased two airplanes at a foreclosure sale. At the time of the purchase, the airplanes had been leased to Southwest Airlines, Inc., and were used by Southwest as commercial passenger airplanes. The plaintiff's purchase of the airplanes did not terminate Southwest's lease of the airplanes, nor did the purchase interrupt Southwest's continuous use of the airplanes in interstate commerce. According to the Department of Treasury, by owning the airplanes, leasing the airplanes to Southwest, and allowing Southwest to fly the airplanes into and out of a Detroit airport, the plaintiff "used" the airplanes in Michigan within the meaning of the UTA.

On appeal, this Court disagreed, *id.* at 417-419, finding that if any entity "used" the airplanes within Michigan, it was Southwest:

> [I]t is undisputed that plaintiff bought the airplanes subject to preexisting leases with Southwest. Under the leases, Southwest completely controlled the flight schedules and the routine maintenance of the airplanes. In addition, the leases held Southwest responsible for ensuring that the aircraft remained registered with the FAA [Federal Aviation Administration] in the name of the lessor. Under the UTA, the tax is imposed for "the privilege of using, storing, or consuming tangible personal property in this state . . . ." MCL 205.93(1); MSA 7.555(3)(1). If any of these privileges were utilized, it was done by Southwest, not plaintiff. "Use" means *"the exercise of a right or power* over tangible personal property incident to the ownership of that property . . . ," MCL 205.92(b); MSA 7.555(2)(b) (emphasis supplied), which plaintiff did not do. Because of the leases, plaintiff at no time used, stored, or consumed the property in Michigan. Despite plaintiff's ownership

interest in the airplanes, the leases gave exclusive authority over the use, storage, and consumption of the airplanes during the duration of the leases to Southwest, and thus plaintiff exercised no right or power over the airplanes. In other words, by virtue of the leases, plaintiff ceded control of the airplanes to Southwest, and therefore could not have "used" the airplanes for purposes of use tax liability under the UTA.

. . . While the leases did not give Southwest *permanent* control of the airplanes, we conclude that the leases gave Southwest *total* control of them, because pursuant to the leases Southwest was responsible for the flight schedules and general maintenance of the planes. Plaintiff did not direct Southwest's routes or otherwise exercise dominion over Southwest's use of the planes. [Emphasis in original.]

In this case, a review of the carrier contract and the distribution contract establishes that API did not cede total control of the directories while the directories were transported in Michigan by the contract carrier or when they were distributed to Michigan businesses and residences by the PDC. Pursuant to the carrier contract, API's responsibilities included the "scheduling of directory printing, transportation and distribution from [Donnelly's plant in Dwight, Illinois] to the end user." Pursuant to the distribution contract, the PDC was to complete the initial delivery by the date specified by API.[5] The distribution contract provided that in completing the door-to-door distribution of the directories to residences, the PDC was to place each directory in a bag[6] and then place the directory on the hinged side

---

[5] The distribution contract refers to SBCDO (SBC Distribution Office). We assume SBC is the parent company of API.

[6] The distribution contract also required the PDC to place in the bag any advertising inserts, such as coupons, product samples, magnets, or CD-ROMS, submitted by Advertising Media Solutions. The PDC was given instructions on where to place the advertising inserts in the bag relative to the directory.

of the door; the PDC was not to place the directory in the residence's mailbox. Delivery of directories to residences was to take place between dusk and dawn. However, door-to-door distribution of directories to businesses was only to take place between the hours of 8:00 a.m. and 6:00 p.m. The PDC was to deliver the directories inside the place of business, and it was required to obtain customer signatures from a certain percentage of the businesses.[7]

In completing the initial mail distribution, the PDC was to shrink-wrap all directories to be mailed and deliver the directories to the local post office five or eight days, depending on the number of directories to be mailed, before the delivery start date.[8] The PDC could not convert a hand delivery route into a mail route without the approval of API. In addition, in completing the secondary distribution, the PDC was required to hand deliver directories to a minimum of 65 percent of the new telephone customers.

The distribution contract required the PDC to implement a quality-assurance program using an Interactive Voice Response (IVR) system. API reserved the right to approve any IVR script used by the PDC. Requirements regarding how many IVR confirmations of receipt of the directory the PDC must obtain for each delivery route

---

[7] The PDC was responsible for obtaining adequate staffing for distribution of the directories. However, the distribution contract provided the minimum requirements for adequate staffing, which included a management team, an administrative staff, a distribution staff, and data processors.

The PDC was also responsible for securing leases for offices and warehouses necessary for it to fulfill its responsibilities under the distribution contract. However, API reserved the right to review and approve any lease executed by the PDC.

[8] The distribution contract contained instructions on where the PDC was to place the mailing label on mailed directories.

were specified in the distribution contract, as were instructions for when a delivery route must be pulled for manual investigation and instructions on how to complete a manual investigation. And, it was API, rather than the PDC, who held the ultimate authority to decide whether to redeliver directories on a given route.

Throughout the distribution cycle, the PDC was required to provide API with numerous reports regarding its quality-assurance program and the number of directories delivered. The reports included a daily report chronicling the progress of the door-to-door initial distribution, weekly and monthly reports on the number of directories mailed during the initial distribution, and monthly reports regarding the number of directories delivered and mailed during the secondary distribution. Finally, pursuant to the distribution contract, all directories remaining at the end of a distribution cycle remained the property of API and were to be disposed of by API's recycling supplier of choice.

Here, unlike the plaintiff in *Sharper Image* who lost all control over the catalogs once the catalogs were delivered to the post office, API never lost all control over the directories after the directories were transported from Donnelly's printing facility to the PDC's distribution centers. In other words, although it was the PDC's responsibility to distribute the directories to Michigan residences and businesses, the PDC did not have exclusive authority over the distribution. API informed the PDC of the date a distribution was to be completed. API instructed the PDC on what hours it was to distribute the directories, where it was to place the directories at a residence, and, when directories were to be mailed, when they were to be received by the local post office. Through the reports the PDC was

required to provide, API continually monitored the PDC's progress in distributing the directories. API also set the minimum requirements for the PDC's staffing, and instructed the PDC on the type of quality-assurance program it was to implement. API retained possession of any unused directories, which were to be disposed of by the recycler of API's choice. Under these circumstances, API exercised "a right or power over [the directories] incident to the ownership of [the directories]," MCL 205.92(b), while the directories were in Michigan. Accordingly, API "used" the directories in Michigan.

### B. PRICE

A person using tangible personal property in Michigan shall pay use tax "at a rate equal to 6% of the price of the property . . . ." MCL 205.93(1). The UTA defines the "price" of property, in pertinent part, as

> the aggregate value in money of anything paid or delivered, or promised to be paid or delivered, by a consumer to a seller in the consummation and complete performance of the transaction by‾ which tangible personal property or services are purchased or rented for storage, use, or other consumption in this state, without a deduction for the cost of the property sold, cost of materials used, labor or service cost, interest or discount paid, or any other expense. [MCL 205.92(f).]

The Department determined that the "price" of the directories included the cost of the paper and the cost of Donnelly's printing services. API argues that neither should be included in the "price" of the directories.

### 1. PRINTING SERVICES

API claims that the cost of the printing services provided by Donnelly cannot be included in the "price" of the directories because, pursuant to *Flexitype & Douglas Offset Co v Dep't of Treasury*, 52 Mich App 153;

216 NW2d 609 (1974), printing services are not subject to the sales tax. API argues that, because of the complementary nature of the UTA and the GSTA, the UTA was not intended to tax services that are not taxable under the GSTA. In this regard, API points out that, during the refund period, the UTA only provided for the taxation of telecommunication services and hotel services. See MCL 205.93a. In addition, API claims any conclusion that the cost of the printing services are to be included in the "price" of the directories would render meaningless the Supreme Court's adoption of the "incidental to service" test in *Catalina Marketing Sales Corp v Dep't of Treasury*, 470 Mich 13; 678 NW2d 619 (2004).

The GSTA provides for a tax on the gross proceeds of sales at retail of tangible personal property. *Univ of Michigan Bd of Regents v Dep't of Treasury*, 217 Mich App 665, 669; 553 NW2d 349 (1996); *Flexitype, supra* at 155; see also MCL 205.52(1). Generally, the GSTA does not apply to sales of services. *Catalina, supra* at 19.

In *Flexitype*, Flexitype, a commercial printing company, agreed to print Detroit Edison's company magazine. Detroit Edison provided the paper and all matter to be printed on the paper. Flexitype was only required to print the magazine, assemble it into a finished product, and deliver it to Detroit Edison. In billing Detroit Edison, Flexitype did not charge a sales tax. However, the defendant, the Department of Treasury, issued sales tax assessments against Flexitype for the period it provided printing services to Detroit Edison. The disputed issue was whether Flexitype had made a sale at retail to Detroit Edison. This Court found determinative of the issue the then-existing definition of "sale at retail": " 'any transaction by which is transferred for consideration *the ownership of tangible per-*

*sonal property* * * *.' " *Flexitype, supra* at 156, quoting MCL 205.51(b) (emphasis in original). According to the Court, Flexitype did not make a sale at retail because it never owned either the tangible or intangible content of the magazines. *Flexitype, supra* at 156. Rather, at all times, Detroit Edison controlled and owned the tangible and intangible content of the magazines. *Id.*

In *Catalina, supra*, Catalina contested the assessment of sales tax by the defendant, the Department of Treasury, on its Checkout Coupon™ program. Under the program, Catalina contracted with manufacturers of consumer products to deliver a coupon or advertising message to shoppers as they checked out at a grocery store on the basis of what the shoppers had bought. It was undisputed that Catalina's transactions with the manufacturers involved both the provision of services —advertising research and expertise—and the transfer of tangible personal property—slips of paper with coupons or advertising messages. Because the GSTA only applies to sales of tangible personal property, not the sales of services, it was necessary to categorize the transactions as either a service or a tangible property transaction. *Catalina, supra* at 19. The Supreme Court adopted the "incidental to service" test for categorizing a transaction involving both the provision of services and the transfer of tangible personal property as either a sale of services or a sale of tangible personal property. *Id.* at 24. Under this test, " 'sales tax will not apply to transactions where the rendering of a service is the object of the transaction, even though tangible personal property is exchanged incidentally.' " *Id.*, quoting 85 CJS 2d, Taxation, § 2018, p 976.[9]

---

[9] The Supreme Court remanded the case to the Tax Tribunal to apply the "incidental to service" test. *Catalina, supra* at 26. In a subsequent order, the Supreme Court affirmed the decision of the Tax Tribunal on

API contends that application of the "incidental to service" test to the facts of the present case dictates a conclusion, consistent with *Flexitype*, that the object of its transaction with Donnelly was the procurement of a service. We need not decide this issue.

The Court's holding in *Flexitype* and our Supreme Court's adoption of the "incidental to service" test in *Catalina* are not relevant to whether the Department properly included the cost of Donnelly's printing services in the "price" of the directories. The issue in both *Flexitype* and *Catalina* was whether there had been a taxable event, i.e., a sale at retail of tangible personal property. However, in the present case, we have already concluded that there was a taxable event, i.e., API's "use" of the directories in Michigan. See part III(A) of this opinion. Having determined there was a taxable event, the issue is whether, pursuant to MCL 205.92(f), the Department properly included the cost of Donnelly's printing services in the "price" of the directories. The analysis of this issue must start with the language of MCL 205.92(f), see *Hills of Lone Pine Ass'n v Texel Land Co, Inc*, 226 Mich App 120, 123; 572 NW2d 256 (1997) ("The starting point in every case involving construction of a statute is the language itself."), not whether printing services are a taxable event under the GSTA. Moreover, by relying on *Flexitype* and *Catalina*, along with the fact that during the refund period the UTA only taxed a limited number of services, API's argument fails to account for the distinction between the *imposition* of a tax and the *measure* of the tax. In this case, the Department imposed a use tax on API because API "used" the directories in Michigan. The Department did not directly impose the use tax on the

---

remand that Catalina's provision of services provided to the manufacturers was the object of the transaction. *Catalina Marketing Sales Corp v Dep't of Treasury*, 471 Mich 1209 (2004).

printing services provided by Donnelly. Rather, the Department used the cost of Donnelly's printing services, along with the cost of the paper, as part of the *measure* of the use tax it imposed for API's use of the directories in Michigan.

## 2. PAPER

API argues that, because the paper was consumed in Illinois, rather than in Michigan, when it was converted into the directories, the cost of the paper cannot be included in the "price" of the directories. API's argument is based on the *Morton Buildings* cases. See *Morton Bldgs, Inc v Indiana Dep't of State Revenue*, 819 NE2d 913 (Ind Tax Ct, 2004); *Morton Bldgs, Inc v Comm'r of Revenue*, 43 Mass App Ct 441; 683 NE2d 720 (1997); *Sharp v Morton Bldgs, Inc*, 953 SW2d 300 (Tex App, 1997); *Morton Bldgs, Inc v Bannon*, 222 Conn 49; 607 A2d 424 (1992); *Morton Bldgs, Inc v Chu*, 126 AD2d 828; 510 NYS2d 320 (1987), aff'd 70 NY2d 725 (1987).

The facts in each of the *Morton Bldgs* cases were the same and were undisputed. Morton Buildings engaged in the production, selling, and on-site erection of prefabricated buildings for agricultural and industrial use. Morton purchased raw materials, including steel and timber, and stored the materials in warehouses as inventory. When Morton Buildings received an order for a building from a customer, it removed the necessary materials to build the building from its inventory. It then fabricated the materials into finished building components, such as trusses, columns, purlins, panels, and overhang rafters, and transported the finished components to the building site in the taxing state.[10] At the building site, Morton Buildings

---

[10] Neither the warehouses in which Morton Buildings stored its inventory nor the factories where Morton Buildings fabricated the finished building components were located in the taxing states.

erected the building. The issue in each case was whether the taxing state could impose a use tax on Morton Buildings' use of the building components it fabricated outside the taxing state. In each taxing state, the use tax statute imposed a use tax on all tangible personal property used in the state that was purchased from a "retailer" or a "vendor" (or acquired in a "retail transaction"). Morton Buildings argued that, because it fabricated the materials into the finished building components in factories outside the taxing state, the tangible personal property purchased from a retailer, i.e., the materials, had been used outside the taxing state, while the tangible personal property it used inside the taxing state, i.e., the building components, had not been purchased from a "retailer." The courts in the above-cited *Morton Bldgs* cases agreed. For example, the Indiana Tax Court wrote:

> Manufacturing, by its very nature, results in raw materials losing their identity and becoming part of a new item of tangible personal property. . . .
>
> The Stipulation of Facts reveals that the raw materials go through an extensive production process in Morton's out-of-state factories before they are brought into Indiana as building components. The materials are processed through Morton's machinery, cut to size, and affixed to other materials. . . . The result of this process is a building component that has an entirely different appearance, character, and utility than the raw materials used to fabricate it. In other words, the raw materials are consumed in the out-of-state production process. What remains are the building components, which are not taxable when used in Indiana because they were not acquired in a retail transaction. [*Morton Bldgs, supra*, 819 NE2d at 916-917.][11]

---

[11] But see *Morton Bldgs, Inc v Comm'r of Revenue*, 488 NW2d 254, 258 (Minn, 1992), in which the Minnesota Supreme Court rejected Morton Buildings' argument:

We do not find the *Morton Bldgs* cases to be relevant regarding whether the Department properly included the cost of the paper in the "price" of the directories. Like *Flexitype, supra,* and *Catalina, supra,* the issue in the *Morton Bldgs* cases was whether there had been a taxable event, i.e., whether Morton Buildings used tangible personal property purchased "at retail" in the taxing state. However, as already stated, we have already concluded that API's "use" of the directories in Michigan was a taxable event. See part III(A) of this opinion. Thus, the issue is whether, pursuant to MCL 205.92(f), the Department properly included the cost of the paper in the "price" of the directories. Because the *Morton Bldgs* cases did not construe language similar to that contained in the definition of "price" in MCL 205.92(f), we do not find the cases relevant to the issue before us.

### 3. AGGREGATE VALUE

Under the UTA, the price of tangible personal property "used" in Michigan is "the aggregate value in money of anything paid . . . by a consumer to a seller[12]

---

In our opinion, Morton's manufacturing process does not transform the raw materials into something which is not used in Minnesota. Despite their alteration at the factories, the raw materials are still tangible personal property used in Minnesota as parts of Morton's prefabricated buildings. The raw materials, in their altered form as building components, are used in Minnesota when they are erected into prefabricated buildings. Morton clearly exercises a right or power over the raw materials when it constructs the prefabricated building, and thus Morton "uses" the materials in Minnesota.

[12] Neither party contests that API is a "consumer." "Seller" is defined as "the person from whom a purchase is made and includes every person selling tangible personal property or services for storage, use, or other consumption in the state." MCL 205.92(d). The UTA defines "purchase" as "to acquire for a consideration . . . ." MCL 205.92(e). Here, API

in the consummation and complete performance of the transaction . . . ." MCL 205.92(f). Here, the complete performance of the transaction includes the production of the directories. API's purchase of the paper from the paper mills and its purchase of printing services from Donnelly were necessary and incidental to the transaction. See *Kal-Aero, Inc v Dep't of Treasury*, 123 Mich App 46, 51; 333 NW2d 171 (1983). API could not have obtained the directories without purchasing the paper or without purchasing Donnelly's printing services. Paper and printing services are necessary to the mass production of any telephone directory.

The aggregate value of the transaction is to be determined "without a deduction for the cost of the property sold, cost of materials used, labor or service cost, interest or discount paid, or any other expense." MCL 205.92(f). By arguing that neither the cost of printing services nor the cost of the paper can be included in the "price" of the directories, API is essentially asking for a deduction equivalent to the cost of materials used and services provided. MCL 205.92(f) unambiguously prohibits such deductions, and we must enforce an unambiguous statute as written, *Rowland, supra*. Accordingly, because API paid the cost of the paper and the cost of printing services in the complete performance of the transaction, the Department correctly included the costs of the paper and the printing services in the "price" of the directories.

### C. DOUBLE TAXATION

Finally, API claims that, because the customers of the telecommunication services provided by its affiliated

---

acquired for consideration printing services from Donnelly and paper from the paper mills. Accordingly, because purchases were made from them, Donnelly and the paper mills are "sellers."

companies are required to remit use tax on those services, see MCL 205.93a, if the Department is allowed to tax API's costs of producing the directories, the costs of the directories would be subject to double taxation.

In making its argument, API relies solely on the following two paragraphs from the Department's Revenue Technical Tax Training Manual:[13]

> If a company sells 1,000 items of its product to a customer and gives the customer an additional 10 items of the product free, the additional 10 items are not considered taxable giveaway items. There is one gross selling price on the 1,010 items. The gross proceeds would be the amount charged for the 1,000 items.

> A *"tie-in" sale requires someone to first buy tangible personal property in order to receive a different item free.* There is an advertisement that an item will be received free at the time of purchase. The advertised item given away with the "tie-in" sale is not subject to use tax. A portion of the gross proceeds received from the sale is attributed to the free item. [Emphasis added.]

Even assuming that the manual cited by API carries the force of law, API's argument is without merit. API claims that the directories were a "tie-in" to the telecommunication services provided by its affiliated companies. However, telecommunication services are not tangible personal property. API has presented no evidence that the customers of its affiliated companies bought any tangible personal property before receiving the directories.

Double taxation occurs when a second tax is imposed on the same property, for the same purpose, and by the

---

[13] This manual was prepared as an "instructional text" to be used in classroom training on the GSTA and the UTA. It expressly stated that it was "not intended as a statement of law" and was "intended only for training purposes."

same sovereign during the same taxing period. *C F Smith Co v Fitzgerald*, 270 Mich 659, 685; 259 NW 352 (1935). API has not proffered any evidence that the use tax paid by the customers of the telecommunication services provided by its affiliated companies is based, in part, on the costs paid by API in purchasing the paper used in the directories or in purchasing Donnelly's printing services. Accordingly, API's costs in producing the directories are not subject to double taxation.

Affirmed.