# STATE OF MICHIGAN

# COURT OF APPEALS

---

AUTO-OWNERS INSURANCE COMPANY,

Plaintiff-Appellee,

v

DEPARTMENT OF TREASURY,

Defendant-Appellant.

FOR PUBLICATION
October 27, 2015
9:00 a.m.

No. 321505
Court of Claims
LC No. 12-000082-MT

---

Before: GADOLA, P.J., and JANSEN and BECKERING, JJ.

PER CURIAM.

Defendant appeals as of right a final order for the refund for use taxes. We affirm.

## I. FACTS

Plaintiff is a Michigan corporation headquartered in Lansing, Michigan. Plaintiff provides insurance services and is represented by over 35,000 independent agents in 26 states. Plaintiff entered into a variety of contracts between December 1, 2006, and December 31, 2010. Many of these contracts used complex and "modern" computing arrangements between plaintiff and the third-party companies, which led to the instant controversy regarding whether these contracts were subject to Michigan's Use Tax Act (UTA), MCL 205.91 *et seq*. The six main categories of contracts include: (1) insurance industry specific contracts, (2) technology and communications contracts, (3) online research contracts, (4) payment remittance and processing support contracts, (5) equipment maintenance and software customer support contracts, and (6) marketing and advertising contracts.

### A. INSURANCE INDUSTRY SPECIFIC CONTRACTS

Plaintiff entered into six contracts in this category. First, plaintiff entered into a contract to utilize the services of Marshall & Swift/Boeckh ("MSB"). MSB provides building information to plaintiff. Plaintiff's agents submit building factors to MSB through the Internet. MSB then analyzes the data and provides plaintiff with a valuation number to aid plaintiff in determining the appropriate value for building insurance. There is no indication in the record that plaintiff used MSB's software or had MSB software on its computers during the years at issue. Plaintiff also entered into a contract to utilize the services of Valen Technologies, Inc. ("Valen"). Valen provides services to help plaintiff evaluate risks and underwrite insurance policies. Valen works with plaintiff to develop a model specifically tailored to plaintiff. With

-1-

regard to the model, an agent for plaintiff enters information and data on the Internet through plaintiff's custom interface. The data is submitted to Valen, which runs the data through the model. The result is a score from 1 to 20, with 1 representing the best account to underwrite, and 20 representing the worst account to underwrite. Valen operates its own software to run the model, and plaintiff did not receive, license, or have access to Valen's software.

Plaintiff also contracted with the Association for Cooperative Operations Research and Development ("ACORD"), which is a nonprofit organization that aids in the development of open consensus data standards and standard insurance forms. ACORD provides national insurance standards that create a common coding system for data fields in insurance data transmissions. The ACORD standards create the ability to employ a standard format for the flow of information to and from insurance agencies and to governmental agencies. Plaintiff paid a membership fee to ACORD during the tax years at issue and received ACORD's data standards. According to plaintiff, it did not purchase, receive, or license software from ACORD.

Plaintiff also contracted with CoreLogic's Proxix Solutions ("Proxix") with regard to its business in Kentucky. Proxix provides a geospacial system, which identifies and verifies the municipality in which a specific piece of property is located. In response to a database query, plaintiff provides longitude and latitude information to Proxix. In response, Proxix verifies and identifies where property is located. Plaintiff also contracted with IVANS, Inc. ("IVANS"), which is an electronic communication service that aids in managing the confidentiality of data. This system allows parties using different technology infrastructure to communicate. IVANS uses a data exchange service to translate data from plaintiff to an agent system while plaintiff and the agent system use their own technology infrastructure. When an agency writes a new automobile insurance policy, the agency compiles information on its computers, and then that information is sent via the IVANS data exchange system to plaintiff. Plaintiff uses the same secured data line to send back the information that comprises the policy report. Plaintiff uses the IVANS system by sending encrypted data to an IP address. Plaintiff also uses the IVANS system to report information to government agencies, including delivering automobile policy information to the state's department of motor vehicles. Plaintiff did not receive or download any software in regard to its use of the IVANS system.

Plaintiff also utilized Lexis-Nexis Choicepoint ("Lexis-Nexis"), which provides data on motor vehicle records and sends electronic notices regarding motor vehicle coverage to secured parties. With regard to the data program, an independent agent inputs information over the Internet or uses an electronic form to conduct a search. Plaintiff's computer system then sends data to Lexis-Nexis, which utilizes its in-house database to provide more detailed information to plaintiff. Plaintiff then forwards the results to the independent agent. Plaintiff cannot access the database. Only plaintiff sent data to Lexis-Nexis, and Lexis-Nexis delivered information on the basis of the input data. With regard to the electronic notices, Lexis-Nexis provides a web-based electronic mailing service. Plaintiff collects information and sends the information through a FTP (file transfer protocol) to Lexis-Nexis. Lexis-Nexis uses the information to send notices to secured parties or lienholders.

## B. TECHNOLOGY AND COMMUNICATIONS

Plaintiff entered into two contracts that fall under this category. The first contract was with Cisco WebEx, LLC ("WebEx"). WebEx provides videoconferencing services, webinar services, and online meeting services. The services work through a link to WebEx's website. According to plaintiff, there was no licensing involved, and only the meeting organizer was required to have a license. WebEx also provides a support center, which several members of plaintiff's Automation Support unit downloaded. The support center is downloaded through a click box, which opens a session on the user's computer and works with WebEx in fixing any problems.

Plaintiff also contracted with LogMeIn, which provides remote access so that an employee can work on his home computer as if he were sitting at his desk at work. The employee accesses LogMeIn through a website, or portal hosted by LogMeIn, and inputs a password. In order for the system to work, an incidental local client, or desktop agent, must be installed locally on each personal computer using the system. LogMeIn also provides thumb and flash drives that can be used to access the system from a third-party computer. According to plaintiff, it did not receive any additional property or software from LogMeIn.

## C. ONLINE RESEARCH

Plaintiff also contracted with West, a Thomson Reuters business, in order to conduct legal research by using its online database service. West provides its services through the Internet, and plaintiff did not receive any disks or software from West. Plaintiff also contracted with Wolters Kluwer for an online subscription to Insource Services ("NILS"). The subscription includes insurance-specific laws, filing guidelines, attorneys general opinions, and bulletins. The online services are housed with Wolters Kluwer, and not with plaintiff. Although plaintiff received a portion of the NILS materials (excluding insurance filing guidelines) in book and print materials, it argues that it subscribed with the intention of obtaining online access, not the printed materials.

## D. PAYMENT REMITTANCE AND PROCESSING SUPPORT

Plaintiff contracted with RT Lawrence ("RTL") for payment processing services. RTL's system uses scanners to capture images of checks and stubs and software to validate data and compare amounts. RTL's software was loaded onto plaintiff's computers. The software uses plaintiff's scanners to process information. The scanners capture images of both the check and the stub, and use plaintiff's internal codes to minimize user verification by comparing amounts and validating data. Plaintiff also contracted for support and maintenance of the scanners, training, and customer support. According to plaintiff, the transaction that was taxed was solely for software maintenance and support.

E.  EQUIPMENT MAINTENANCE AND SOFTWARE CUSTOMER SUPPORT

Plaintiff also contracted with several companies with regard to software it had already purchased, including with Data Center Management Systems, Duck Creek, GT Software, and Software AG USA.  Plaintiff contends that all the transactions that were taxed involved support and maintenance of existing software.  The invoice that Data Center Management Systems sent to plaintiff states that plaintiff was billed for maintenance.  The invoice related to Duck Creek provides that plaintiff was billed for maintenance.  The invoice at issue with regard to GT Software indicates that plaintiff was billed a "Software Fee" in relation to a software upgrade.  However, the contract between plaintiff and GT Software provides that 12% of the software licensing fee is for maintenance and support.  Plaintiff sought a refund for the use tax paid on the amount that constituted maintenance and support.  Software AG's invoices do not clarify whether Software AG billed plaintiff for software or for maintenance.  However, the contract between Software AG and plaintiff provides that $73,210 of the software price is for technical services.  Plaintiff sought a refund for the taxes paid on this amount.[1]

F.  MARKETING AND ADVERTISING

Plaintiff also entered into several contracts with marketing and advertising companies, including Third Person Creative ("TPC"), Harvest Music and Sounddesign ("Harvest"), and Main Media Marketing ("MMM").  TPC reviewed plaintiff's marketing prices and provided ideas related to branding.  TPC also provided marketing strategies, conducted investigations, and provided ideas for advertisements.  Harvest wrote and produced commercials for plaintiff.  Plaintiff received digital files containing the commercials.  MMM established websites and developed search engine optimization queries for plaintiff.  MMM also hosted websites and implemented a pilot program on the Internet for plaintiff.

II.  PROCEDURAL HISTORY

Defendant conducted a use-tax audit of plaintiff covering December 1, 2006, to December 31, 2010.  The auditors determined two bases for use tax liability: (1) fixed asset purchase, and (2) expense items by looking at purchases.  The auditors reviewed the fixed-asset purchases for the entire audit period.  In regard to expense items, the auditors used a block sampling method with 2010 as the sample year.  On March 28, 2012, defendant issued a bill for taxes due and assessed a use-tax deficiency and interest for a total of $871,625.24.  Plaintiff paid the amount due, as well as additional interest, under protest.

---

[1] There were a number of other transactions in this category.  However, neither party discusses the other transactions in this category on appeal.  Plaintiff argues that all of the transactions in this category involved support and maintenance of existing software.  Defendant does not challenge this assertion with regard to the transactions that the parties do not mention on appeal.  Therefore, to the extent that defendant challenges any other transactions in this category, defendant abandons the argument on appeal.  See *Woods v SLB Prop Mtg, LLC*, 277 Mich App 622, 626-627; 750 NW2d 228 (2008) (" '[A]n appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue.' ") (citation omitted).

On June 29, 2012, plaintiff filed a complaint in the Court of Claims, seeking a refund of the use tax paid to defendant. Plaintiff asserted (1) that the products were not prewritten computer software, (2) that under *Catalina Mktg Sales Corp v Dep't of Treasury*, 470 Mich 13; 678 NW2d 619 (2004), any software involved was incidental to the services the products provided, (3) that defendant unlawfully assessed Michigan use tax on transactions subject to Michigan sales tax, and (4) that defendant used improper audit methods. After discovery was conducted, plaintiff moved for summary disposition under MCR 2.116(C)(10). Defendant filed a response, arguing that plaintiff was not entitled to summary disposition and that summary disposition in favor of defendant was proper under MCR 2.116(I)(2).

The Court of Claims granted plaintiff's motion for summary disposition under MCR 2.116(C)(10). The Court of Claims first determined that the transactions were not subject to use tax since the software involved in the case was not "delivered by any means." Focusing on the dictionary definition of the word "deliver," the Court of Claims held that the software was not "handed over, left, or transferred" to plaintiff because any software remained on the third-party server, and what was transferred to plaintiff was information that has been processed using the third-party's software, hardware, and infrastructure. The Court of Claims also noted that the Legislature could not have contemplated the transactions involved because on the effective date of the relevant statute, September 1, 2004, software was delivered electronically or physically, and the court would have to extend the construction of the phrase "delivered by any means" in order to include remote access technology. The Court of Claims next held that even if "prewritten computer software" was "delivered" to plaintiff, defendant's assessment would still be invalid because plaintiff did not exercise the requisite "use" to subject the software to Michigan's use tax. The court held that plaintiff had no control over the underlying software used by the third-party companies to complete the necessary tasks. Instead, plaintiff was only able to input data in order to control outcomes.

The court next held that even if "prewritten computer software" was "delivered" to and "used" by plaintiff, such use was merely incidental to the services rendered by the third-party providers and would not subject the overall transactions to use tax. The court did not address plaintiff's argument that it cannot be held responsible for use tax simply because the sales took place within Michigan, or plaintiff's argument challenging defendant's audit methods. The Court of Claims also entered a final order for refund of taxes.

## III. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Williams v Enjoi Transp Solutions*, 307 Mich App 182, 185; 858 NW2d 530 (2014). "In reviewing a grant of summary disposition under MCR 2.116(C)(10), this Court considers the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Id*. Summary disposition is appropriate when there is no genuine issue of material fact and the party moving for summary disposition is entitled to judgement as a matter of law. *Id*.

The UTA is analyzed under the general rules of statutory interpretation. *Ameritech Publishing, Inc v Dep't of Treasury*, 281 Mich App 132, 135; 761 NW2d 470 (2008). We review de novo issues of statutory interpretation. *Id*. at 135-136. We construe a statute in order

to determine and give effect to the Legislature's intent. *Id*. at 136. "The goal of statutory interpretation is to discern the intent of the Legislature by examining the plain language of the statute." *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 303 Mich App 441, 447; 844 NW2d 727 (2013), aff'd 497 Mich 337 (2015). "If the language employed by the Legislature is unambiguous, the Legislature is presumed to have intended the meaning clearly expressed, and this Court must enforce the statute as written." *Ameritech Publishing, Inc*, 281 Mich App at 136. "Tax laws will not be extended in scope by implication or forced construction." *Id*. An ambiguity in a tax law is construed in favor of the taxpayer. See *id*.

## IV. USE OF PREWRITTEN COMPUTER SOFTWARE

Defendant argues that the Court of Claims erred when it determined that the transactions were not taxable under the UTA. We disagree.

The UTA is designed to cover actions that are not covered under the general sales tax act (GSTA), MCL 205.51 *et seq*. *WPGP1, Inc v Dep't of Treasury*, 240 Mich App 414, 416; 612 NW2d 432 (2000).

> A sales-use tax scheme is designed to make all tangible personal property, whether acquired in, or out of, the state subject to a uniform tax burden. Sales and use taxes are mutually exclusive but complementary, and are designed to exact an equal tax based on a percentage of the purchase price of the property in question. [*Catalina*, 470 Mich at 19 n 3 (citation and quotation marks omitted).]

The use tax is levied "for the privilege of using, storing, or consuming tangible personal property" in Michigan. MCL 205.93(1). The use tax is assessed "at a total combined rate equal to 6% of the price of the property or services." *Id*.

"Use" is defined in the UTA as "the exercise of a right or power over tangible personal property incident to the ownership of that property including transfer of the property in a transaction where possession is given." MCL 205.92(b). The UTA does not explain what a right or power incident to ownership of tangible personal property entails. However, this Court has held that the key feature in determining whether a party exercised a right or power over tangible personal property is whether the party had some level of control over the tangible personal property. See *WPGP1, Inc*, 240 Mich App at 417-419 (noting that the plaintiff did not "use" airplanes under the meaning of the term in the UTA since the plaintiff did not have control over them).

"Tangible personal property" is defined as "personal property that can be seen, weighed, measured, felt, or touched or that is in any other manner perceptible to the senses and includes electricity, water, gas, steam, and *prewritten computer software*." MCL 205.92(k) (emphasis added). The UTA defines "prewritten computer software" as "computer software, including prewritten upgrades, *that is delivered by any means* and that is not designed and developed by the author or other creator to the specifications of a specific purchaser." MCL 205.92b(o) (emphasis added). Finally, the UTA defines "computer software" as "a set of coded instructions designed to cause a computer or automatic data processing equipment to perform a task." MCL 205.92b(c).

The UTA does not define the term "deliver." However, this Court may consult a dictionary definition to determine the plain and ordinary meaning of a term. *Aroma Wines*, 303 Mich App at 447.[2] The *Merriam-Webster's Collegiate Dictionary* (2014) defines the term "deliver," in relevant part, as "to take and hand over to or leave for another: CONVEY," and "to send (something aimed or guided) to an intended target or destination." The UTA, therefore, requires that the prewritten computer software be conveyed or handed over by any means. See MCL 205.92b(o); *Merriam-Webster's Collegiate Dictionary* (2014). Therefore, the transactions at issue in this case were taxable under the UTA if plaintiff exercised control over a set of coded instructions that was conveyed or handed over by any means and was not designed and developed by the author or other creator to the specifications of a specific purchaser. See MCL 205.92(k); MCL 205.92b(c) and (o); *Merriam-Webster's Collegiate Dictionary* (2014).

We first note that the Court of Claims incorrectly determined that all software remained on a third-party server. The Court of Claims focused its analysis on the phrase "that is delivered by any means" in the definition of "prewritten computer software," holding that this phrase created a requirement that the software be "delivered" (i.e., handed over, left, or transferred). The court held that no software was ever "delivered" because all software remained on the third-party servers, and what was transferred to plaintiff was information that had been processed using the third-party's software, hardware, and infrastructure. However, a desktop agent was installed on each computer with regard to LogMeIn, and RTL used software that runs locally on plaintiff's computers. Therefore, the Court of Claims erred to the extent that it found that all software was located on third-party servers.

In addition, the Court of Claims applied a narrow definition of the term "deliver" without examining how the term operates in the broader context in which it is placed. The meaning of language cannot be divorced from the context in which it is found. *Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 508; 866 NW2d 817 (2014) (" 'Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used.' ") (citation omitted). The phrase "delivered by any means" indicates that the Legislature was aware that software could be purchased at a store and "delivered" by tangible storage media, or purchased online and "delivered" electronically. See MCL 205.92b(o). By using the word "any," the Legislature made plain that the means by which the software is delivered is immaterial. Therefore, the Court of Claims improperly narrowed the scope of the term "deliver" to preclude electronic delivery. See MCL 205.92b(o); *Rental Props Owners Ass'n*, 308 Mich App at 508. However, the Court of Claims correctly determined that the mere transfer of information and data that was processed using the software of the third-party businesses does not constitute delivery by any means of

---

[2] We disagree with defendant's assertion that the meaning of the term "deliver" is readily discernable from reading the statute itself. Plaintiff and defendant dispute whether the term "deliver" includes accessing the functionality of prewritten computer software, and the statute does not clarify this point. Therefore, the plain and ordinary meaning of the term is unclear, and it is proper to consult a dictionary to determine the plain and ordinary meaning. See *Aroma Wines*, 303 Mich App at 447.

prewritten computer software. See MCL 205.92b(o). In that situation, no prewritten computer software is delivered, and only data resulting from third-party use of software is delivered. See *id*.

The majority of the transactions in this case were not taxable under the UTA because they did not involve the delivery of prewritten computer software by any means. With regard to West, plaintiff never exercised an ownership-type right or power over any West computer software. Instead, all the code remained on West's server. West controlled the code, maintained it, and updated it as it saw fit. Plaintiff only accessed a website that allowed it to submit requests to the West system that controlled the code. Accessing West's code in such a limited manner is not an exercise of a right or power over the code incident to the ownership of that code because accessing the code in such a limited manner does not signify ownership. Therefore, plaintiff did not use tangible personal property with regard to West. See MCL 205.92(b); MCL 205.92b(o); *WPGP1, Inc*, 240 Mich App at 417-419.

The same is true for the online services provided by Wolters Kluwer. Plaintiff accessed the Wolters Kluwer system via web browser, and plaintiff never had access to any of the code that enabled the Walters Kluwer website and its features. Therefore, plaintiff never used prewritten computer software from Wolters Kluwer under the meaning of the UTA. See MCL 205.92(b); MCL 205.92b(o).[3] However, plaintiff did receive print materials from Wolters Kluwer, which constitutes tangible personal property. See MCL 205.92(k). Plaintiff exercised a right over the print materials incident to ownership since plaintiff received the print materials from Wolters Kluwer, had possession over the print materials, and was able to use them at will. See MCL 205.92(b); *WPGP1, Inc*, 240 Mich App at 417-419. Therefore, plaintiff used tangible personal property under the meaning of the UTA in connection with the print materials. See *id*.

In regard to MSB, plaintiff's computer system sent data electronically to MSB, MSB processed the data, and then MSB sent back a number indicating the appropriate value for the building insurance. Under this arrangement, plaintiff never had access to any of the code that enabled MSB's system. The same is true for Valen. Plaintiff's computer system sent data electronically to Valen, Valen processed the data through its econometric model, and Valen returned a numerical score from 1 to 20 to plaintiff. Plaintiff never had access to any of the code that enabled Valen's system. Likewise, with Proxix, plaintiff queried the Proxix database for longitude and latitude information to identify the Kentucky municipality in which a specific Kentucky property was located. Plaintiff never had access to any of the code that enabled Proxix's system. Thus, plaintiff never used prewritten computer software with regard to these companies. See MCL 205.92(b); MCL 205.92b(o); *WPGP1, Inc*, 240 Mich App at 417-419.

---

[3] Defendant determined that the transactions involved prewritten computer software on the basis of the contracts between plaintiff and the third-party companies. However, the agreements do not establish that prewritten computer software was delivered. Instead, to the extent that the agreements provide for the delivery of prewritten computer software, the agreements only contemplate the delivery on a future date and do not indicate that prewritten computer software was delivered on the dates that the agreements were signed. See MCL 205.92b(o).

Similarly, TPC reviewed plaintiff's marketing prices and provided ideas related to branding and advertising. Harvest wrote and produced commercials for plaintiff. MMM established websites and developed search engine optimization queries for plaintiff. MMM also hosted websites and implemented a pilot program on the Internet for plaintiff. None of the three marketing and advertising companies delivered prewritten computer software to plaintiff. Plaintiff never had access to any of the code that enabled the systems of TPC, MMM, or Harvest. Therefore, these transactions were not subject to taxation under the UTA. See MCL 205.92(b); MCL 205.92b(o).

With Lexis-Nexis, plaintiff's computer system sent data electronically to Lexis-Nexis, and Lexis-Nexis processed the data and then returned more detailed information to plaintiff. Plaintiff never had access to any of the code that enabled the Lexis-Nexis system. As for sending notices to lienholders and secured parties, plaintiff uploaded a file to the Lexis-Nexis server, and then Lexis-Nexis processed that file and sent out the necessary notices. Likewise, under this arrangement plaintiff never had access to any of the code that enabled the Lexis-Nexis system. Therefore, plaintiff did not use tangible personal property under the meaning of the UTA with regard to Lexis-Nexis. See MCL 205.92(b); MCL 205.92b(o); *WPGP1, Inc*, 240 Mich App at 417-419.

Plaintiff never had access to any ACORD code because there is no ACORD code. The "data standards information" that ACORD provides is not "computer software" because it does not "cause a computer to perform a task." See MCL 205.92b(c). Rather, all plaintiff has is access to a list of standards that help it and the other members use a common coding system for their data fields. Similarly, plaintiff contracted with IVANS to use its secure communication infrastructure, which IVANS built and maintains. Plaintiff never had access to any code that enabled the IVANS system, and plaintiff used its own code to access the IVANS system. Therefore, plaintiff did not use tangible personal property under the meaning of the UTA with regard to IVANS and Accord. See MCL 205.92(b); MCL 205.92b(o); *WPGP1, Inc*, 240 Mich App at 417-419.

Finally, plaintiff entered into a number of contracts with software companies to provide maintenance and support services. The transactions with Data Center Management Systems and Duck Creek involved software maintenance. Defendant failed to present evidence in the Court of Claims showing that prewritten computer software was delivered to plaintiff in connection with the transactions with Data Center Management Systems and Duck Creek. Instead, plaintiff presented evidence that it transacted with the companies for software support and maintenance. Therefore, the support and maintenance transactions were not subject to taxation under the UTA since they involved the provision of services, rather than the delivery by any means of prewritten computer software. See MCL 205.92(b); MCL 205.92b(o). As noted above, plaintiff conceded in its motion for summary disposition that the transactions involving GT Software and Software AG included the purchase of software. However, plaintiff argued that the invoices included amounts for maintenance and support, and plaintiff requested a refund with regard to these amounts. Plaintiff was entitled to a refund with regard to these amounts since the cost for maintenance and support was separately listed in the agreements between the parties, and no prewritten computer software was delivered to plaintiff in exchange for the amount taxed for software maintenance and support. MCL 205.92(b); MCL 205.92b(o).

However, plaintiff received prewritten computer software that was delivered to it with regard to several of the transactions at issue in this case. With regard to WebEx, plaintiff purchased access to a network that is designed and used for web-conferencing. Plaintiff accessed the WebEx system via the WebEx website and never had access to any code that enabled the WebEx system. See MCL 205.92(b); MCL 205.92b(o). However, WebEx provided a support center, which was downloaded onto several computers and aided the user in fixing problems. The support center constituted computer software since it was a set of coded instructions designed to cause a computer or automatic data processing equipment to perform a task. See MCL 205.92b(c). The prewritten computer software was delivered to plaintiff since it was downloaded onto plaintiff's computers at plaintiff's request. See MCL 205.92b(o). Plaintiff had control over the control center when it used the program. It did not merely access the functionality of the software. See *id*. Therefore, plaintiff exercised an ownership-type right or power over the support center since the software was installed on plaintiff's computers, and plaintiff was able to control when and how the software was used. See MCL 205.92(b); *WPGP1, Inc*, 240 Mich App at 417-419.

Plaintiff also used prewritten computer software provided by RTL. The software was delivered since plaintiff had actual possession of the software. Plaintiff ran the software on its own computers and used the software at its own will. Under these circumstances, plaintiff exercised an ownership-type right or power over the software from RTL by taking possession of the software, physically installing the software on its computers, and using the software as it wished. See MCL 205.92(b); MCL 205.92b(o); *WPGP1, Inc*, 240 Mich App at 417-419. Plaintiff did not merely access the functionality of the software. See *WPGP1, Inc*, 240 Mich App at 417-419. Plaintiff argues that defendant taxed the remaining balance on an invoice for maintenance of the RTL software, rather than for the software itself. RTL sent plaintiff an initial invoice with regard to the transaction at issue, and RTL later sent plaintiff an invoice for the remaining balance on the initial invoice. The first entry on the initial invoice was for software, and the remaining entries were for support. The invoice for the remaining balance did not separately list the amount owed for maintenance and support. Thus, the transaction at issue involved the delivery by any means of prewritten computer software since prewritten computer software was delivered to plaintiff, and there is no indication that the transaction that was taxed only involved the provision of services. See MCL 205.92(b); MCL 205.92b(o); *WPGP1, Inc*, 240 Mich App at 417-419.

With regard to LogMeIn, plaintiff used a remote access agent that LogMeIn supplied and that was necessary to run locally on plaintiff's machines in order to access the network and its features. The local client, or desktop agent, was installed on each computer. The desktop agent constituted prewritten computer software since it included a set of coded instructions designed to cause the computer to perform a task. See MCL 205.92b(c). The software was delivered since plaintiff had actual possession of the desktop agents. Plaintiff used the software since it ran the software on its own computers and could control the software at its own will. See MCL 205.92(b); *WPGP1, Inc*, 240 Mich App at 417-419. Plaintiff also received a number of flash drives and thumb drives from LogMeIn, which also constitute tangible personal property. See MCL 205.92(k). Under these circumstances, plaintiff exercised an ownership-type right or power over tangible personal property by taking possession of the property, physically installing the software on its computers, and using the software and drives as it wished. See MCL

205.92(b).  Therefore, plaintiff used the tangible personal property provided by LogMeIn under the meaning of the term in the UTA.  See *id*.


## V.  INCIDENTAL TO SERVICE TEST

Although plaintiff exercised a right or power over tangible personal property, the transfer of tangible personal property was incidental to the rendering of professional services.  The test for determining whether a business relationship that involves both the transfer of personal property and the provision of services constitutes a nontaxable service or a taxable property transaction is the "incidental to service" test.  *Catalina*, 470 Mich at 24.  "The 'incidental to service' test looks objectively at the entire transaction to determine whether the transaction is principally a transfer of tangible personal property or a provision of a service." *Id*. at 24-25.  The Michigan Supreme Court in *Catalina* adopted the following six-factor test for determining whether the transfer of tangible personal property is incidental to the rendering of professional services:

> In determining whether the transfer of tangible property was incidental to the rendering of personal or professional services, a court should examine what the buyer sought as the object of the transaction, what the seller or service provider is in the business of doing, whether the goods were provided as a retail enterprise with a profit-making motive, whether the tangible goods were available for sale without the service, the extent to which intangible services have contributed to the value of the physical item that is transferred, and any other factors relevant to the particular transaction.  [*Id*. at 26.][4]

The software and other tangible personal property provided to plaintiff were incidental to the services that the companies provided to plaintiff.  The first factor concerns what plaintiff sought as the object of the transactions.  For WebEx, Auto-Owners primarily sought access to networking infrastructure.  With regard to RTL, plaintiff sought a system that could capture images of checks and stubs, validate the data on the checks and stubs, and compare it to other data to minimize user verification.  For the transactions with Wolters Kluwer, plaintiff sought online information services.  However, with regard to LogMeIn, plaintiff sought the software and drives that were designed to allow remote computer access, as well as the web-based access.

---

[4] The Michigan Supreme Court articulated the incidental to service test in the context of a challenge under the GSTA, rather than the UTA.  See *Catalina*, 470 Mich at 25.  However, neither party challenges whether the incidental to service test applies with regard to the UTA.  Furthermore, the test that the Michigan Supreme Court articulated applies broadly to all business relationships that involve both the provision of services and the transfer of personal property.  See *id*. at 24.  The Court did not limit the standard to transactions under the GSTA.  See *id*. at 14, 24-26.

Thus, this factor weighs in favor of plaintiff for every transaction except for the transaction with LogMeIn. See *Catalina*, 470 Mich at 26.

The second factor concerns what the seller or service provider is in the business of doing. WebEx provides access to networking infrastructure that it maintains. RTL is in the business of streamlining remittance processing, reconciliation, and research. LogMeIn is in the business of providing a system that is designed to allow remote computer access. Wolters Kluwer is in the business of providing information services. Thus, all of the businesses provide services. Therefore, this factor weighs in favor of plaintiff. See *Catalina*, 470 Mich at 26.

The third factor is whether the tangible personal property was provided as part of a retail enterprise with a profit-making motive. All the transactions that involved the transfer of personal property occurred with for-profit retail enterprises. However, each business had a motive to profit from providing a service to plaintiff, rather than from providing tangible personal property to plaintiff. With regard to RTL, the motive of the company is to provide payment and remittances services. The software that was downloaded on plaintiff's computers was only an insignificant part of the overall transaction. See *Catalina*, 470 Mich at 26. WebEx had a motive to provide web-based conference services, and the support center was a minor part of the larger enterprise. See *id*. Wolters Kluwer also had a motive to provide information services, rather than tangible property. See *id*. The issue is a closer call with regard to LogMeIn. LogMeIn provided desktop agents and thumb or flash drives to users in order to facilitate the remote access program. However, the required software was minimal in light of the extensive computing and networking infrastructure that LogMeIn maintained so that the software could operate properly. Therefore, this factor weighs in plaintiff's favor as well. See *id*.

The fourth factor is whether the tangible goods were available for sale without the service. For all the transactions, there is no indication that plaintiff could purchase any underlying tangible personal property without purchasing the services. Instead, plaintiff obtained the tangible personal property only when it contracted for services. There is no indication that any of the companies provided software or other tangible personal property apart from the services it provided. Thus, this factor weighs in favor of plaintiff. See *Catalina*, 470 Mich at 26. The fifth factor is the extent to which intangible services have contributed to the value of the physical item that is transferred. Here, the prewritten computer software and other tangible personal property provided had no value without the associated services. The only tangible personal property that may have had some value apart from the services was the print materials provided by Wolters Kluwer. Therefore, this factor weighs in favor of plaintiff for each transaction except for the transaction with Wolters Kluwer. See *id*.[5]

Considering all of the factors together, the tangible personal property was incidental to the services that plaintiff received. With regard to Wolters Kluwer, RTL, LogMeIn, and WebEx, plaintiff contracted with the businesses in order to receive services, and the tangible personal

---

[5] We do not find any other factor relevant in determining whether the transfer of tangible personal property was incidental to the provision of services as the first five factors encompass the main features of each transaction. See *Catalina*, 470 Mich at 26.

-12-

property was merely incidental to the provision of services. There is no indication that plaintiff could purchase the software or other tangible personal property independent of the services, and the services gave value to the software and other tangible personal property. See *Catalina*, 470 Mich at 26. Therefore, the transactions were not taxable under the UTA. See *id*. Accordingly, the trial court did not err in granting plaintiff's motion for summary disposition. See *id*. We need not address the other issues raised in defendant's brief on appeal since we conclude that the trial court properly determined that the transactions were not subject to taxation under the UTA.

Affirmed. No costs, a public question being involved. See MCR 7.219(A).


/s/ Michael F. Gadola
/s/ Kathleen Jansen
/s/ Jane M. Beckering