*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

BED BATH & BEYOND, INC.,

Plaintiff-Appellee,

UNPUBLISHED
July 8, 2021

v

No.   352088, 352667
Court of Claims
LC No.   18-000220-MT

DEPARTMENT OF TREASURY,

Defendant-Appellant.

Before:  MARKEY, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

This case involves the construction and application of the Michigan Use Tax Act (UTA), MCL 205.91 *et seq.*  Defendant Department of Treasury (the Department) appeals by right a stipulated amended final judgment and underlying written opinion and order that denied the Department's motion for summary disposition under MCR 2.116(C)(10) and instead granted summary disposition in favor of plaintiff Bed Bath & Beyond, Inc., under MCR 2.116(I)(2).  In ruling for plaintiff, the Court of Claims concluded that plaintiff did not "use" its postcards, circulars, coupons, and newspaper inserts (advertising materials) in Michigan for the tax period at issue because it "deferred all aspects of delivery" to a third-party direct mail vendor.  The Court of Claims determined that there had not been "sufficient retention of control" of the advertising materials by plaintiff to constitute "use" as defined in the UTA.  We affirm.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a New Jersey corporation engaged in the business of selling household products and furnishings through its national chain of retail stores.  For the timeframe at issue, August 1, 2008, through July 31, 2012, plaintiff operated 31 stores in Michigan.  To promote its business, plaintiff produced advertising materials that were delivered to its Michigan customers through the mail.  These materials were addressed directly to the customers and delivered via the United States Postal Service (USPS).  Plaintiff generated 800 to 900 million such advertisements annually, only a portion of which were delivered to Michigan customers.

Plaintiff designed the advertising materials in-house, which was outside the State of Michigan.  Plaintiff would then purchase the requisite paper product and send it to a printer.  The

printing company would in turn print the advertising materials as designed by plaintiff. These activities did not take place in Michigan. After the advertising materials were printed, plaintiff directed the printer to send the materials to Harte Hanks Mailing House—a mail vendor under contract with plaintiff to provide mail services. None of Harte Hanks's locations were in Michigan. The contractual role of Harte Hanks was to process and prepare the advertising materials for mailing to plaintiff's customers. After processing and preparation, Harte Hanks entered the advertising materials into the USPS mail stream at the most efficient points of origin.

More specifically, Harte Hanks printed addresses on the advertising materials generated from an "audience file" owned by Harte Hanks, which built upon plaintiff's proprietary mailing list. The materials would be sorted by Harte Hanks for mailing based on USPS requirements. Harte Hanks either bundled or trayed the advertising materials, shrink-wrapped them on pallets, and tagged the pallets by destination for bulk delivery to USPS mail distribution centers. Harte Hanks determined where the materials entered the USPS system—at either network distribution centers or sectional center facilities—based on postage rates, the number of advertisements, and the locale to which the advertisements would be delivered. Once the appropriate USPS centers and facilities were determined, Harte Hanks would load the pallets onto its trucks for delivery to those locations.

For plaintiff's advertising materials destined for Michigan customers, Harte Hanks prepared those materials at its Pennsylvania facility because it was closest to Michigan. In September 2008, Harte Hanks delivered approximately 4.1 percent of plaintiff's advertising materials handled by Harte Hanks to 11 USPS centers and facilities in Michigan for distribution. This amounted to over 1.7 million pieces of mail delivered in Michigan. In December 2011, Harte Hanks delivered around 4.8 percent of plaintiff's advertising materials handled by Harte Hanks to the USPS centers and facilities in Michigan. This totaled more than 2 million pieces of advertising materials sent to homes in Michigan. Plaintiff paid Harte Hanks for freight service costs related to the delivery of the materials to Michigan USPS centers and facilities. On some occasions, for smaller campaigns, Harte Hanks would deliver the advertising materials to the local USPS center closest to a Harte Hanks facility.

These distribution activities occurred repetitively according to plaintiff's annual schedule of promotional events, which it developed for purposes of running its ad campaigns and which reflected each event date and the quantity of advertising materials for each related mail drop. Because the advertising materials included coupons that had to be redeemed in-store by a certain date, plaintiff used the schedule to direct Harte Hanks with respect to when the ads should be delivered. After preparation of the advertising materials using Harte Hanks's audience file, which included plaintiff's Michigan customers for its Michigan stores, and delivering the materials to the USPS centers and facilities, Harte Hanks provided plaintiff a distribution report. The report showed plaintiff when its advertising materials entered the mail stream and how quickly the materials reached the marketplace in relation to a coupon's expiration date reflected on the annual schedule.

In July 2012, the Department initiated a use tax audit to determine any difference between the correct tax and the reported tax liability for the tax period of August 1, 2008, through July 31, 2012. During the audit, the Department discovered that plaintiff had not remitted any use tax on its advertising accounts related to the advertising materials sent to Michigan customers. The

Department found that the advertising materials were subject to use tax. Plaintiff took the position that no use tax was owed, relying on this Court's decision in *Sharper Image Corp v Dep't of Treasury*, 216 Mich App 698, 702-704; 550 NW2d 596 (1996), in which the panel held that the distribution of mail-order catalogs mailed from a Nebraska USPS facility to Michigan residents was not a taxable use. The Department disagreed with plaintiff's stance, and it subsequently issued a notice of preliminary audit determination in the amount of $513,927 due and owing in use taxes, including interest.

After the Department issued its intent to assess use taxes in August 2016, plaintiff timely requested an informal conference to dispute the assessment. Plaintiff argued, in relevant part, that it did not engage in a taxable use in Michigan because under the opinion in *Sharper Image*, its rights and powers over the advertising materials ended when it effectuated the delivery of the materials to the USPS in another state. The hearing referee rejected this argument, reasoning that the law had changed after *Sharper Image* and that this Court in *Ameritech Publishing, Inc v Dep't of Treasury*, 281 Mich App 132, 136; 761 NW2d 470 (2008), held that distribution could be a taxable use. The hearing referee further observed:

> Petitioner asserts that, because it did not exercise any rights or powers over the advertising material while the material was in Michigan, it did not "use" the advertising material in Michigan. Petitioner exercised ownership over the direct mail that was distributed in the State of Michigan. Petitioner directed every step of the process in creating, printing, and determining the parameters of when and where the advertising material was to be distributed. The right to control what happens to one's property is one of the most fundamental rights incident to ownership. Additionally, Petitioner directed that the materials were to be distributed and received by its customers or potential customers in the State of Michigan. Distribution of direct mail, as defined by the UTA, on the direction of the taxpayer to recipients in the State of Michigan demonstrates the exercise of a right of ownership of that property. Similar to the taxpayer in *Ameritech Pub.*, Petitioner retained control of the advertising material throughout the process demonstrating that it exercised the rights of ownership over the property.

The Department thereafter issued a decision and order of determination accepting the referee's recommendation, and it issued a final assessment for $552,589.78 in use taxes, including interest.

Plaintiff then filed a complaint in the Court of Claims alleging in relevant part that it had not engaged in a taxable use with respect to the distribution of its advertising materials in Michigan for the period in dispute. In particular, plaintiff alleged that it had ceded all physical control over the advertising materials once they were delivered to Harte Hanks and that plaintiff's ability to exercise rights over the materials terminated upon deposit of the materials at USPS distribution centers.

After discovery, the Department moved for summary disposition under MCR 2.116(C)(10). The Department argued that plaintiff's distribution of the advertising materials fell within the UTA's definition of "use." According to the Department, because plaintiff controlled when the advertising materials were delivered, how many pieces were delivered, to whom they were delivered in Michigan, and how the materials were used by setting coupon redemption terms,

plaintiff used the property, and it was thus subject to taxation. Plaintiff countered that it ceded total control over the advertising materials to Harte Hanks once it provided Harte Hanks its customer list and the printed materials. Plaintiff posited that Harte Hanks had sole responsibility for selecting which Michigan residents would receive the advertising materials and determining where the materials would enter the USPS system. Plaintiff asked the Court of Claims to deny the Department's motion for summary disposition and to instead declare that the use tax assessment was void and invalid.

In its written opinion and order, the Court of Claims denied the Department's motion and instead granted summary disposition in favor of plaintiff under MCR 2.116(I)(2). After discussing both *Sharper Image* and *Ameritech Publishing*, the Court of Claims concluded that the circumstances in the instant case were more comparable to the facts in *Sharper Image*. The Court of Claims reasoned:

> On the spectrum of *Sharper Image* and *Ameritech Pub*, the Court concludes that the instant case is far more comparable to the factual scenario in *Sharper Image* than it is to *Ameritech Pub*, and that plaintiff did not retain the requisite control over the distribution for plaintiff to have "used" the advertising materials in Michigan under the UTA. Stated otherwise, plaintiff in the instant case, like the plaintiff in *Sharper Image*, only specified that the materials be delivered. Unlike the plaintiff in *Ameritech Pub*, plaintiff in the instant case did not fill in the precise details of when, how, and where the materials were to be delivered. Indeed, plaintiff merely arranged for Harte Hanks—after Harte Hanks arranged for the materials to be shipped to its location—to ready the advertising materials for mailing as Harte Hanks saw fit. Harte Hanks owned the mailing lists and controlled how the advertising materials would arrive to customers via the USPS. Harte Hanks made arrangements and judgments about how to have the materials delivered in accordance with USPS constraints and postage rates. Plaintiff only provided an annual schedule for delivery, but left all the other details of the delivery and distribution to Harte Hanks. Plaintiff's control ended when it left all pertinent details to Harte Hanks's discretion. Similar to the plaintiff in *Sharper Image*, plaintiff in the instant case "retain[ed] no control over [the materials] once they are delivered to the postal service." *Sharper Image*, 216 Mich App at 700. Also similar to the factual scenario present in *Sharper Image*, there is no evidence in this case suggesting that plaintiff controlled any aspect of the delivery other than specifying that delivery should occur within a general timeframe. For instance, there is no record evidence that plaintiff demanded that the materials be delivered in a specific manner; instead, plaintiff deferred the delivery logistics to Harte Hanks. In short, any actions plaintiff took with respect to the advertising materials, as well as any control over the same, ended before the materials reached this state.

As additional support, the Court of Claims distinguished this case from *Ameritech Publishing* by noting that "[p]laintiff lacked the detailed, precise delivery plan employed by the plaintiff in *Ameritech Pub*." By way of example, the Court of Claims pointed out that there were no quality assurance programs or detailed instructions in this case, unlike in *Ameritech Publishing* where the plaintiff required its distributor to "hand-deliver many of the directories, with specific instructions where, when, and how to leave the directories at customer sites." The Court of Claims

determined that "plaintiff deferred all aspects of delivery to Harte Hanks, which is not a sufficient retention of control so as to constitute 'use' under the UTA." The Court of Claims declared that the use tax assessment was void, cancelling it in its entirety.

The Department moved for reconsideration arguing, in part, that the Court of Claims' analysis with respect to "use" was factually and legally erroneous. The Department also noted that the Court of Claims, by cancelling the entire assessment, erroneously cancelled portions of the assessment related to unchallenged audit adjustments. The Court of Claims denied the motion, except as to the amount, directing plaintiff to respond to the matter regarding unchallenged adjustments or taxes. In its response, plaintiff pointed out that it had already paid a portion of the assessment related to audit adjustments that were unchallenged. Thereafter, the Court of Claims entered a stipulated amended final judgment, which only cancelled the remaining balance of the final assessment relative to the advertising materials. The amount remaining in dispute with regard to the advertising materials was $316,942 in use tax and interest. The Department now appeals by right.

## II. ANALYSIS

### A. OVERVIEW OF APPELLATE ARGUMENTS

On appeal, the Department argues that tangible personal property is subject to use tax when a taxpayer exercises its rights of ownership over the property within the boundaries of Michigan. The Department contends that the record demonstrated that plaintiff controlled not only aspects of delivery of the property, i.e., the advertising materials, but also imposed requirements with respect to how and when the materials could be used after delivery to Michigan residents. According to the Department, this evidence sufficed to establish that the advertising materials were subject to use tax. The Department maintains that the Court of Claims erred by focusing solely on whether plaintiff controlled matters of delivery or distribution when it should have also considered whether plaintiff exercised control over the advertising materials after they had been delivered to Michigan residents. Plaintiff argues that the mere distribution of advertising materials without indicia of control does not constitute a taxable use. Plaintiff asserts that it did not exercise the required level of control over the property in Michigan so as to implicate the UTA. Finally, plaintiff claims that how Michiganders used the advertising materials after delivery is irrelevant to the issue of plaintiff's alleged control for purposes of the use tax.

### B. STANDARD OF REVIEW AND GOVERNING PRINCIPLES

This Court reviews de novo a ruling on a motion for summary disposition rendered by the Court of Claims. *GMAC LLC v Dep't of Treasury*, 286 Mich App 365, 372; 781 NW2d 310 (2009). MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along

with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5).[1]

"A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact." *Pioneer State*, 301 Mich App at 377. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). *Pioneer State*, 301 Mich App at 377. "Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994). A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999); see also MCR 2.116(G)(6).

Under MCR 2.116(I)(2), "[i]f it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party." "Summary disposition may be granted in favor of an opposing party under MCR 2.116(I)(2) if there is no genuine issue of material fact and the opposing party is entitled to judgment as a matter of law." *City of Holland v Consumers Energy Co*, 308 Mich App 675, 681-682; 866 NW2d 871 (2015).

This case entails construing the UTA, and we review de novo issues of statutory interpretation. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008). In *Wayne Co v AFSCME Local 3317*, 325 Mich App 614, 633-634; 928 NW2d 709 (2018), this Court recited the well-established principles of statutory interpretation:

> The primary task in construing a statute is to discern and give effect to the Legislature's intent, and in doing so, we start with an examination of the language of the statute, which constitutes the most reliable evidence of legislative intent. When the language of a statutory provision is unambiguous, we must conclude that the Legislature intended the meaning that was clearly expressed, requiring enforcement of the statute as written, without any additional judicial construction.

---

[1] MCR 2.116(G)(4) provides:

> A motion under subrule (C)(10) must specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact. When a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her.

Only when an ambiguity in a statute exists may a court go beyond the statute's words to ascertain legislative intent. We must give effect to every word, phrase, and clause in a statute, avoiding a construction that would render any part of the statute nugatory or surplusage. [Citations omitted.]

We are also mindful that "when interpreting a tax statute, this Court must keep in mind that the authority to tax must be expressly provided. Tax laws will not be extended in scope by implication or forced construction. When there is doubt, tax laws are to be construed in favor of the taxpayer." *Ameritech Publishing*, 281 Mich App at 136 (citations omitted).

## C. DISCUSSION

Under the UTA, "[t]here is levied upon and there shall be collected from every person in this state a specific tax, including both the local community stabilization share and the state share, for the privilege of *using*, storing, or consuming tangible personal property in this state at a total combined rate equal to 6% of the price of the property . . . ." MCL 205.93(1) (emphasis added). "The use tax is complementary to the sales tax and is designed to cover those transactions not covered by the General Sales Tax Act." *Sharper Image*, 216 Mich App at 701. In *WMS Gaming, Inc v Dep't of Treasury*, 274 Mich App 440, 443; 733 NW2d 97 (2007), this Court explained:

> The imposition of a use tax . . . is not, as the trial court concluded, a tax imposed on an out-of-state purchase. Rather, it is a tax imposed on the use of that property that was purchased out-of-state and then imported into Michigan for use. It is the use in Michigan that is taxed under the use tax, precisely because it is not subject to the sales tax. It has long been held that the tax on the use of imported goods is not a tax on out-of-state sales even if that tax is based on the purchase price in the other state.

The UTA defines the term "use" to "mean[] the exercise of a right or power over tangible personal property incident to the ownership of that property including transfer of the property in a transaction where possession is given." MCL 205.92(b). This Court has observed that "[t]he UTA does not explain what a right or power incident to ownership of tangible personal property entails." *Auto-Owners Ins Co v Dep't of Treasury*, 313 Mich App 56, 70; 880 NW2d 337 (2015). That said, we have "held that the key feature in determining whether a party exercised a right or power over tangible personal property is whether the party had some level of control over that property." *Id.* With respect to the statutory definition of "use" in the UTA, our Supreme Court in *NACG Leasing v Dep't of Treasury*, 495 Mich 26, 29 n 9; 843 NW2d 891 (2014), noted that "[i]mportant rights flowing from property ownership include the right to exclusive possession, the right to personal use and enjoyment, *the right to manage its use by others*, and the right to income derived from the property." (Quotation marks and citation omitted; emphasis added.)

This Court has addressed the question of taxable "use" in the context of mail distributions to Michigan residents in two published cases—*Sharper Image* and *Ameritech Publishing*. In *Sharper Image*, 216 Mich App at 700-701, the panel confronted the following facts:

> The essential facts of this case are not in dispute. In addition to owning two stores operating in Michigan, plaintiff, a foreign corporation, conducts business in

-7-

Michigan through mail-order catalogs. Plaintiff's catalogs are produced by a printer in Lincoln, Nebraska, and shipped through the mail from the printer's place of business. The catalogs are sent by third-class mail, and plaintiff retains no control over them once they are delivered to the postal service. Undelivered catalogs are destroyed by the postal service.

From 1986 through 1990, plaintiff timely filed its tax returns. Defendants, however, assessed a use tax deficiency of $63,440 plus interest, claiming plaintiff failed to pay the use taxes on (1) the use of the catalogs in Michigan, and (2) for transportation charges plaintiff requires its customers to pay on merchandise purchased by mail order. Ultimately, plaintiff paid the amount due under protest and initiated this suit for a refund.

Plaintiff then moved for summary disposition pursuant to MCR 2.116(C)(10), claiming that (1) "use" under the UTA did not include distribution of catalogs from an out-of-state source, (2) the use tax on catalogs violated the Commerce Clause of the United States Constitution, and (3) because the UTA taxes the "price" of the goods, the separately stated transportation charges may not be taxed.

The trial court disagreed with plaintiff's arguments, denied its motion, and in turn, granted summary disposition for defendants pursuant to MCR 2.116(I)(2). It is from this order that plaintiff appeals.

The Court stated that "under the plain wording of the statute, in order to be taxed under the UTA, a taxpayer must perform in Michigan one of the activities listed in the definition of 'use.'" *Id.* at 702. The panel concluded that the "plaintiff's exercise of a right or power over the catalogs ended when the catalogs were delivered to the postal service in Nebraska." *Id.* This Court distinguished cases from other jurisdictions where "the taxpayer enjoyed indicia of control over the material not here present[,]" and where "[s]uch indicia of control included the power to determine in what publications the advertisements were to be placed and at what time they would be distributed." *Id.* at 704. The *Sharper Image* panel additionally ruled:

Second, we find no provision in the statutory definition of "use" to allow defendants to tax the distribution of catalogs. Had the Legislature intended for distributions to be taxed, it could have easily done so by expressly providing it in the definition of use. Indeed, the Legislatures of other jurisdictions have done this. Our Legislature, however, did not include distribution in the definition of use, and we will not extend the tax to that activity absent the statutory authority to do so. [*Id.* at 703.]

In sum, the Court held that "because we conclude plaintiff did not exercise sufficient control over the catalogs in Michigan, and because the UTA does not define a 'use' to include the distribution of material, we find that the use tax may not be applied here." *Id.* at 704.

Twelve years later, this Court addressed the taxability of mail distributions in *Ameritech Publishing*, 281 Mich App at 133-135, wherein the Court addressed the following circumstances:

[The plaintiff] API and the Department submitted the case to the Court of Claims on the following stipulated facts. API published and distributed telephone directories to business and residential customers in Michigan. R.R. Donnelly & Sons Company (Donnelly) printed, bound, and cut the directories at its printing facility in Dwight, Illinois.

The publishing of the directories involved three steps. First, API developed the content to be published in the directories. After API completed creating the content, which consisted of a page-by-page presentation of the directories, API provided the content to Donnelly in electronic format. Second, API purchased the paper on which Donnelly was to print the directories. API entered into contracts with non-Michigan paper mills for the paper. Although the paper mills shipped the paper directly to Donnelly's printing facility in Dwight, Illinois, API took title of the paper before Donnelly used the paper to print any directories. Donnelly maintained API's paper separate from all other paper in its plant, and it was only allowed to use API's paper for the directories. Third, API procured printing services from Donnelly. After Donnelly printed the content supplied by API on the paper, Donnelly cut and bound the paper into finished directories.

API entered into an agreement with a contract carrier for transportation of the directories (carrier contract) and with a product development corporation (PDC) for distribution of the directories (distribution contract). The contract carrier transported the finished directories from Donnelly's printing facility in Dwight, Illinois, to the PDC's distribution centers located throughout Michigan. Then, over the course of several weeks, the PDC distributed the directories to local businesses and residences. In general, the PDC's distribution of the directories consisted of two phases: (1) the "initial distribution," where the PDC completed door-to-door distribution of the directories and mailed directories to remote and rural areas and to controlled-access locations, such as condominium complexes and gated communities; and (2) the "secondary distribution," which consisted, in part, of the PDC's delivering directories to new telephone users and to customers requesting additional directories.

During the refund period, API remitted use tax to the Department based on the cost of the paper it purchased from the paper mills and the cost of Donnelly's printing services. In February 2002, API sought from the Department a refund in the amount of $3,519,409.13, which equaled the amount of use taxes it alleged it had overpaid during the refund period. The Department denied the refund request, and the Court of Claims upheld the denial.

In determining whether the directories were subject to use tax, this Court first rejected API's claim that distribution can never be taxable per *Sharper Image*:

We disagree with API's assertion that the Court's holding in *Sharper Image* suggests that a distribution of tangible personal property can never be a taxable "use" of the property under the UTA. In *Sharper Image*, the Court's holding that the plaintiff's distribution of the catalogs in Michigan was not subject to a use tax

was two-fold: (1) the plaintiff did not exercise "a right or power" over the catalogs in Michigan, and (2) the Legislature did not include distributions within the list of activities subject to the UTA. On the basis of the first part of the Court's holding, we conclude that under MCL 205.92(b) a distribution of tangible personal property is a "use" subject to the UTA if the owner of the property exercised "a right or power . . . incident to the ownership of that property" while the property was in Michigan. [*Ameritech Publishing*. 281 Mich App at 139 (citation omitted).]

The *Ameritech Publishing* panel indicated that a party no longer exercises a right or power over property when it has ceded complete control of the property to a third party. *Ameritech Publishing*, 281 Mich App at 140. Applying this principle to the facts, the Court found that the carrier and the distribution contracts reflected "that API did not cede total control of the directories while the directories were transported in Michigan by the contract carrier or when they were distributed to Michigan businesses and residences by the PDC." *Id.* at 141. After reviewing the particulars of the contractual obligations, *id.* at 141-143, this Court held as follows:

Here, unlike the plaintiff in *Sharper Image* who lost all control over the catalogs once the catalogs were delivered to the post office, API never lost all control over the directories after the directories were transported from Donnelly's printing facility to the PDC's distribution centers. In other words, although it was the PDC's responsibility to distribute the directories to Michigan residences and businesses, the PDC did not have exclusive authority over the distribution. API informed the PDC of the date a distribution was to be completed. API instructed the PDC on what hours it was to distribute the directories, where it was to place the directories at a residence, and, when directories were to be mailed, when they were to be received by the local post office. Through the reports the PDC was required to provide, API continually monitored the PDC's progress in distributing the directories. API also set the minimum requirements for the PDC's staffing, and instructed the PDC on the type of quality-assurance program it was to implement. API retained possession of any unused directories, which were to be disposed of by the recycler of API's choice. Under these circumstances, API exercised "a right or power over [the directories] incident to the ownership of [the directories]," MCL 205.92(b), while the directories were in Michigan. Accordingly, API "used" the directories in Michigan. [*Ameritech Publishing*. 281 Mich App at 143-144 (alterations in original).]

Simply put, we agree with the trial court that this case is much more analogous to *Sharper Image* than it is to *Ameritech Publishing*. In this case, plaintiff entered into a contractual relationship with Harte Hanks, an entity that specializes in multi-channel marketing solutions, including direct mail services. Following production of the advertising materials, which occurred outside Michigan, Harte Hanks had the contractual obligation to prepare and deliver them within Michigan, which it did according to its own methodology. Harte Hanks exclusively controlled the packaging of the materials for mailing, and had sole discretion over where the materials would be handed off to the USPS. While plaintiff specified the Michigan residents to whom it wanted the advertising materials delivered by providing its customer mailing list to Harte Hanks, Harte Hanks developed a proprietary "audience file" that it used in the actual distribution of the materials. Harte Hanks packaged the materials in bulk at its Pennsylvania plant and, for an agreed upon rate,

-10-

transported them via freight to USPS locations in Michigan and elsewhere, where the materials entered the mail stream.

At oral argument, counsel for defendant urged that the test we are to employ in this case involves a "binary" choice, meaning that plaintiff's exercise of *any* control of the subject property within Michigan would make its distribution subject to use tax. And indeed, this Court in *Ameritech Publishing* held that, "An owner of tangible personal property no longer exercises 'a right or power over tangible personal property incident to the ownership of that property' when it has ceded *total* control of the property to a third party." *Id*. at 140 (emphasis added). Plaintiff's counsel in turn argued that plaintiff exercised no control over the advertising materials once they turned them over to Harte Hanks, implicitly agreeing that the test is binary. We likewise conclude that an absence of control over the materials within the state's borders makes the distribution non-taxable, while some or any control over the materials within the state's borders makes the distribution taxable.

In this case, the only markers of "power" or "control" of the property are that plaintiff provided Harte Hanks a list of its Michigan customers and that it directed the dates of distribution. It then required a report from Harte Hanks of the actual dates of distribution, which obviously Harte Hanks created and supplied following distribution. We first note that none of these activities involve actual control over the *process* of delivery of the advertising materials, which was exclusively the responsibility of Harte Hanks. Second, it is evident that any distribution of advertising materials by a third-party vendor, as in this case, would have to involve providing the vendor a list of addresses where the materials are to be mailed, and would almost certainly involve some level of control over when the advertiser wishes the materials to be delivered. If such indicia were to be considered adequate "power" or "control" to render the activity subject to the imposition of use tax, then any direct mail campaign originating entirely outside the state would be subject to taxation. Such an outcome would be directly contrary to this Court's holding in *Sharper Image*, which, given the very similar factual records of the two cases, we are bound to apply here. MCR 7.215(J)(1).[2]

---

[2] We recognize that this Court in *Sharper Image*, in the course of reviewing cases from other jurisdictions in which use tax was held to apply, noted that those cases involved "indicia of control over the material not here present. Such indicia of control included the power to determine in what publications the advertisements were to be placed and at what time they would be distributed." *Sharper Image*, 216 Mich App at 704. But our Court in *Sharper Image* also noted that "plaintiff retains no control over [the catalogs] once they are delivered to the postal service." *Id*. at 700. This fact belies the Court's later implication that the plaintiff did not control when the advertisements would be distributed, unless by that the Court meant that the plaintiff could not control the US Postal Service's delivery operations. The fact is that the plaintiff in *Sharper Image* did retain control of when the materials would be distributed to the greatest extent it possibly could, because it determined when the catalogs were conveyed to the postal service. Yet the Court held this was not sufficient "indicia of control" to make the distribution taxable. *Id*. at 704. We likewise conclude that directing or controlling when materials might be placed in the mail, as any direct

-11-

We further reject the Department's contention that plaintiff used the advertising materials after they had been delivered to Michigan residents. The Department argues that an incident of ownership included the right to manage the use of the advertising materials by customers and that plaintiff did so because the advertising materials required customers to present materials at plaintiff's Michigan stores by a specific date selected by plaintiff. We disagree. Simply put, plaintiff no longer exercised a right of power over the advertising materials incident to ownership once in the hands of customers. Rather, the customers became the owners of the advertising materials and could do with them whatever they wished. The mere fact that a customer might not be able to redeem a coupon or take advantage of a sale after a certain date did not translate to plaintiff's "use" of the advertising materials.

Affirmed. Plaintiff may tax costs under MCR 7.219.


/s/ Douglas B. Shapiro
/s/ Michael F. Gadola

---

mail advertiser would, is not an exercise of control over the materials within the state that would subject the distribution to the imposition of use tax.